Priscilla Kelsey ANDREWS and Debra Ann Conn, Appellants in No. 89–1302,

v.

CITY OF PHILADELPHIA and Wilson W. Goode, individually and in his capacity as Mayor, City of Philadelphia, and Kevin M. Tucker, individually and in his capacity as Police Commissioner, and Orville W. Jones, individually and in his capacity as Personnel Director, and Joseph Liciardello, individually and in his capacity as Captain, Accident Investigation Division, and John Doe, individually and in his capacity as a Philadelphia Police Officer Assigned to Accident Investigation Division, and Frank Doyle, individually and in his capacity as Sergeant, Accident Investigation Division.

Appeal of Frank DOYLE and Joseph Liciardello.

Nos. 89–1207 and 89–1302.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1989.

Decided Feb. 8, 1990.

Jane R. Goldberg (argued), Joyce S. Mozenter, Mozenter, Molloy & Durst, Pamela Cohen, Philadelphia, Pa., for appellants in No. 89–1302.

Richard G. Freeman (argued), Deputy City Solicitor, Philadelphia, Pa., for appellants in No. 89–1207.

Before BECKER, COWEN, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents us with several perturbing issues involving the newly emerging jurisprudence concerning sexual harassment. We must not only enunciate standards to be applied in section 1983 (42 U.S.C. § 1983) claims for sexual harassment and Title VII (42 U.S.C. § 2000e et seq) claims based upon a hostile work environment, but also determine how jury findings in the section 1983 claim affect the Title VII claim. Additionally, we are asked to consider concepts of qualified immunity under section 1983 and municipal liability under both section 1983 and Title VII. Finally, we must also evaluate the tort of intentional infliction of emotional distress under Pennsylvania law.

Plaintiffs, Priscilla Kelsey Andrews (Andrews) and Debra Ann Conn (Conn), were members of the Accident Investigation Division (AID) of the Philadelphia Police Department. Both claim that because of their sex they were harassed by their fellow workers and supervisors. The harassment allegedly included abusive language, destruction of property and work product, anonymous telephone calls and, eventually, physical injury to Andrews. They brought suit on a host of legal theories in the United States District Court for the Eastern District of Pennsylvania against the City of Philadelphia, Mayor Wilson Goode, Police Commissioner Kevin Tucker, Director of Police Personnel Orville Jones, AID Commanding Officer Captain Joseph Liciardello, Andrews' direct supervisor, Sergeant Frank Doyle, and a John Doe defendant.

The section 1983 claims and the intentional infliction of emotional distress claims were tried to a jury and the Title VII claims to the bench. The jury found in favor of Andrews and against Philadelphia, Liciardello and Doyle on Andrews' section 1983 claim. The jury found in favor of Conn against Philadelphia and Liciardello

on Conn's section 1983 claims. The jury found in favor of Conn against Liciardello and in favor of Andrews against Liciardello and Doyle on the claims for intentional infliction of emotional distress. The court in separate findings entered immediately after the jury verdict found for the defendant Philadelphia on the Title VII claims.

Following the verdicts, the plaintiffs moved pursuant to Federal Rule of Civil Procedure 59(e) to have the court alter its judgment to make it consistent with the jury's verdict and the defendants moved for judgment notwithstanding the verdict (n.o.v.) on the intentional infliction claims and the section 1983 claims against the City, Liciardello and Doyle. The court denied the plaintiffs' motion, as well as the defendants' motion, with respect to the section 1983 judgments against Liciardello and Doyle but granted the defendants' motion and entered judgment n.o.v. in favor of the defendants on the intentional infliction of emotional distress claims and the section 1983 claim against the City.

Plaintiffs appeal the judgments n.o.v., arguing that there was sufficient evidence to support the jury verdicts. They also appeal the Title VII judgment, arguing that the trial judge misapplied the law and failed to reconcile his decision with the verdict of the jury. Finally, they appeal the earlier entry of a directed verdict in favor of the John Doe defendant. The defendants cross-appeal, arguing that Liciardello and Doyle were protected by their qualified immunity and, thus, judgments n.o.v. should have been granted in the 1983 claims against them. We affirm in part and vacate in part.

### I.

AID is an extremely busy division of the Philadelphia Police Department which investigates vehicular accidents involving property or personal injury. Officers in AID are expected to investigate thoroughly an accident and file a report describing the accident and its causes.

AID is broken down into several squads. Each squad operates independently and works different shifts, under the authority of separate sergeants, though all are under the ultimate authority of the same commanding officer. At her request, the Police Department transferred plaintiff Andrews to AID in February 1986 and assigned her to the squad under the direct supervision of defendant Doyle. Plaintiff Conn was assigned to a different squad in the Division in May 1986. In June 1986 Captain Liciardello became the Commanding Officer of the Division. When the plaintiffs came to AID, males dominated the Division and each plaintiff was the only woman in her squad. Prior to this litigation, they had never met.

According to the plaintiffs, the AID squadroom was charged with sexism. They both claim that women regularly were referred to in an offensive and obscene manner, and that they personally were addressed by the obscenities. Other women in the Division also confirmed the male use of obscenities in referring to women. Although there was evidence that such language was commonplace in police quarters, there was also testimony that such language was not ordinary, and Conn, a twelve-year police veteran, went as far as to say that she "had never been called some of the names that [she] was called in AID."

There was also evidence of pornographic pictures of women displayed in the locker room on the inside of a locker which most often was kept open. Plaintiffs contend that the language and the pictures embarrassed, humiliated and harassed them. Other female officers at AID expressed similar reactions to the pictures and language. The office setup of AID enabled both Liciardello and Doyle to see the pictures and hear the language. This environment led Sergeant Connie Hurst, a female police officer who was at AID during 1986 and 1987, to conclude that AID "was one of the sexist, racist units in the Police Department."

### A.  Andrews

Andrews, a black female, joined the police force in 1980 and went on active duty as a patrol officer in February 1982 in the

Fourth Police District. During her time in the Fourth District she consistently received satisfactory performance ratings, though her supervisor says that she required more direct supervision than other members of the squad. Toward the end of her assignment she lodged a complaint against her supervisor for racial discrimination. The charges were ultimately found to be groundless. In February 1986, pursuant to a transfer application, she was transferred into AID.

Andrews had some difficulty with the work at AID, often making mistakes in conducting investigations and filing reports. Sergeant Doyle found himself compelled to send many case reports back to her for extensive corrections. The parties differ over how severe the mistakes were, with Andrews claiming that they were simply mistakes of inexperience and later harassment, and the defendants claiming that the mistakes were extreme. Andrews also had organizational problems; her files were often disorganized and she often misplaced, forgot, and lost police department equipment. On two instances she even misplaced her weapon. Similarly, against division policy, she on one occasion mistakenly brought six case files home with her on vacation. Nonetheless, she received overall performance evaluations of satisfactory in both of her yearly evaluations at AID, though in her 1987 evaluation, AID graded her unsatisfactory in the categories of quality of work, work habits, and promotional potential.

One particular form of difficulty which plagued Andrews was the loss of her case files. There is no direct evidence of how or why those cases were lost. Andrews contends that her coworkers stole or hid her cases in an attempt to harass her. The defendants claim that she lost the files herself as a result of her carelessness and disorganization. Because she had to reconstruct the lost cases, Andrews fell increasingly behind in her work.

The Division, in an attempt to assist Andrews, gave her additional training and guidance. Sergeant Doyle designed a flow chart to track her cases. Lieutenant Viola Mitchell, a black female superior officer in AID, also gave her a great deal of assistance. Mitchell advised Andrews to keep all of her notes in steno pads and to retain duplicates so if any additional files disappeared it would take less effort to reproduce the report. After these steps were taken the loss of case files abated, but further destruction of Andrews' work product followed. She claims that one steno pad in which she had been taking notes disappeared from the top of her desk, and one after she had given it to Sergeant Doyle during an investigation. Additionally, several cases which Doyle had returned to her for correction were scribbled on while they were on her desk. Later, seven case files on her desk were ripped. Again, it was never determined who removed the steno pads or destroyed the case files.

Andrews further claims that the male officers refused to assist her in her work, further hindering her efforts, although they would often help each other. She says that they completely ignored her and alienated her. Also, she claims that Doyle would not take her off the rotating assignment wheel, and thus give her a lighter case load in order to catch up, although he often took male officers "off the wheel" when they fell behind. Eventually, Doyle did take her "off the wheel" for a day, but then nearly immediately after, he assigned her to a complicated "fatal" case, which she feels should have been assigned to another officer who was also "off the wheel."

Andrews also experienced some vandalism of her personal property. Her car was thrice vandalized while parked in the AID parking lot. On one occasion the tires were slashed; at other times the car was scratched and the windshield wipers removed. However, on the same date that Andrews' tires were slashed, the tires of a male officer in another division also were slashed. Additionally, the same day that her case files were ripped somebody poured soda into her typewriter, forcing her to have it repaired. Finally, someone ripped the cover off her Motor Vehicle Code book, and her appointment book, which she needed to keep track of investigations and court

dates, disappeared. She made complaints about each of these incidents but they were not investigated.

Andrews' problems did not end at the workplace. When she returned home she says she was haunted by anonymous phone calls. These calls were made during two periods of time: the beginning of 1987 and just prior to this suit going to trial. According to Andrews' daughter's testimony, during one of these calls she heard someone say "Yoh, sarge" in the background. During others, the caller told her that her mother was sleeping with Conn and that "[t]hose bitches ain't getting no money because they think they trying to get money but they not going to get none." Although the telephone number was unlisted, AID officers had access to it.

The most egregious incident occurred when a lime substance was placed inside of Andrews' shirt. She had several articles of clothing in her locker in the women's locker room. She testified that when she put on one of the shirts, her back was severely burned by what was later determined to be a lime substance. She, along with Doyle and another sergeant, eventually found additional lime on the other clothing in her locker and on the locker door. Again, it is undetermined who put the lime in her locker and on her clothing. An Internal Affairs Division (IAD) investigation determined that it is unlikely that a male officer could have done it because of the likelihood of detection of a male in the women's locker room. Andrews claims, though, that both male and female officers used the women's locker room.

Following the shirt incident, Andrews was placed on injured duty status. Four days later, she failed to appear in court as scheduled. However, on that same day, she went to IAD to file a complaint about the shirt incident. Subsequently, the AID commanding officer disciplined her for failing to appear in court.

Andrews also contends that Doyle acted toward her in a sexually suggestive manner. She claims that he spent an inordinate amount of time at her desk, something confirmed by Mitchell, and that he breathed heavily down her neck and spoke to her in seductive tones about her and his personal lives. Doyle claims that he spent a lot of time with her because she needed a great deal of supervision. He also claims that his "seductive tone" was nothing more than a hushed tone used so others in the unit would not hear him criticizing Andrews. She also says that lewd pictures were posted on the walls and that she was embarrassed by pornographic pictures placed in her personal desk drawer. She also specifically described salacious, sexist terms addressed to her by her male co-workers.

### B. Conn

Debra Ann Conn, a white female, joined the police force in 1977 and graduated from the Police Academy in 1978. She had several police assignments prior to AID. She consistently received satisfactory reviews and also received several commendations. During her assignment to the Narcotics Division, she was seriously injured while attempting to make an undercover drug deal. She reported that in none of her past assignments did she have any problem getting along with male officers. She was a member of the plaintiff class, though not a named representative, in a prior sex discrimination suit against the Philadelphia Police Department. She transferred into AID in May of 1986.

Upon transferring into AID, Conn faced some sexism, but generally met acceptance. Officer Stock asked her with whom she had slept to get assigned to AID. Stock later propositioned her on several occasions. But overall, she says the squad was "not overtly hostile." In November of 1986, though, Conn temporarily left for training and upon her return she found the makeup of the squad had changed. Only she and Stock remained.

According to Conn, when she returned from training and after she declined Stock's propositions, his attitude towards her changed; it became "aggravated" and "unfriendly." Also, the new squad members were "very indifferent" and "very negative." They refused to help her with

her work, although they helped each other. They also harassed her by placing sexual devices and pornographic magazines in her desk drawer and gathering around and laughing at her reaction. She also recounted the sexually foul and lascivious language addressed to her specifically and women generally. When she complained to her superior, Sergeant Byrne, who was not made a party to the lawsuit, he remained unresponsive.

Conn also had her problems with missing case files. One case file in particular, eventually found, created a problem. Conn had worked on a major train accident. Liciardello needed the file and when he tried to obtain it, he could not find it. Conn, on vacation when Liciardello first looked for the file, returned and also looked for it but without success. The second day after her return, the case was found, reportedly in her briefcase. Conn claims to have checked her briefcase and also asserted that the case had been properly filed in the filing cabinet before she left for vacation. When Liciardello confronted Conn about the file, he tried to determine who might be sabotaging her files. He then warned her, "You know, you're no spring chicken. You have to expect this working with the guys." Several weeks later, after Conn had requested a transfer, Liciardello made a similar comment, saying, "You women don't know what you want. Why don't you stay in one place like a man?"

On a separate occasion five other case files were lost. At this point, Sergeant Byrne became concerned that a pattern was emerging, similar to the incidents involving Andrews, and he communicated with Liciardello and others in AID. Other female officers in AID also became apprehensive and found themselves compelled to take precautionary measures to prevent the disappearance of their cases. Additionally, a roll of film which Conn was using in an investigation also disappeared before it was dispatched for developing. Possibly, the film was accidentally lost or thrown away. AID never conducted an investigation of any of these disappearances. The loss of case files caused anxiety, frustration, and an intolerable work environment,

one, according to Mitchell, where "not even Sherlock Holmes could function."

Conn also experienced vandalism. Someone spit on her coat, cut the band off her hat, and scratched her car. She believed all this damage occurred at AID though her car might have been scratched in front of her residence.

Conn also clashed with her supervisors over an incident involving a pornographic movie which some of the AID officers were watching in the squad room. Conn had been going in and out of the room to ask work-related questions of one of the squad members and to work on the computer located in the room; however, she claims not to have watched the movie. Following this incident, the members of the squad were required to write memoranda concerning the incident. One officer, Corporal De-Jarnette, claims that Sergeant Byrne explicitly instructed him to include Conn among those parties present when the film was shown. Byrne denies this. Conn also received instructions to file a memorandum. When Liciardello determined that her one line memorandum was inadequate, he called her in and threatened to charge her with "moral turpitude," not an offense, if she did not supply additional information about the incident.

Conn stopped reporting to AID in December 1987. When she did not return to work, the Department "sick checked her," in alleged violation of an agreement reached with a Human Relations mediator. She had also begun to receive obscene phone calls at her unlisted phone number. She says that "emotionally I wasn't able to function. I was very scared. I was nervous. I didn't want to go out of the house because I didn't know if someone was going to hurt me." After she used up all of her accrued sick leave and vacation time, she continued to be listed as a police officer although she received no pay after April 1988. The Police Department refused to put her on Injured on Duty status. On June 15, 1988, the Police Department officially separated her.

## II.

Both Conn and Andrews filed complaints with various city, police, and union agencies. The most significant consequence of these complaints was an investigation of their problems by the IAD. Andrews filed her complaint with the IAD on August 11, 1987, and the shirt incident occurred nine days later. The incident thus became part of the investigation. Conn filed her complaint on August 12. Staff Inspector Eichler investigated both cases, interviewed extensively, used other investigative techniques, and filed a report. Prior to the completion of the investigation, Conn and Andrews filed complaints with the Pennsylvania Human Rights Commission.

The IAD investigation, though largely ambiguous, reported that AID had not engaged in any sexual harassment or discrimination. It concluded that Andrews' problems with lost cases were a result of her disorganization and irresponsible work habits, and not because they were lost or stolen; that, in frustration, she had ripped and scribbled on the cases herself; that Doyle's actions were taken in an effort to improve her supervision; moreover, he did not treat her differently because of her sex. It noted that at best Andrews had functioned as a marginal employee for much of her tenure with AID. As to Conn, the report concluded that none of her claims was independently substantiated. On the other hand, plaintiffs claim, with the support of Mitchell's testimony, that this investigation was a sham and little more than a coverup.

Tucker, who reviewed the IAD report independently, evaluated the complaints and the report. He found the report to be inconclusive, and thus decided that it would be inappropriate to take disciplinary measures. He did assign two new female officers to AID as a warning. Tucker personally interviewed each of these officers and informed them that should they experience any problems to contact him directly.

Plaintiffs filed a complaint with the district court on May 23, 1988, after receiving notices from the Equal Employment Opportunity Commission that it had decided not to prosecute the case. Conn and Andrews named as defendants the City, the Mayor, Commissioner Tucker, Director of Police Personnel Jones, Captain Liciardello, Sergeant Doyle, and a John Doe defendant. Andrews claimed causes of action for sexual and racial discrimination under Title VII, denial of equal protection under section 1983, and common law intentional infliction of emotional distress. Conn claimed causes of action for sexual discrimination under Title VII, denial of equal protection and due process under section 1983, common law intentional infliction of emotional distress, and common law wrongful discharge. Through a series of motions at trial, the causes of action and defendants were reduced. The Mayor, Jones, and John Doe were eliminated as defendants and the causes of action for wrongful discharge and due process violations were deleted.[1] Thus, ultimately the jury heard claims by both Andrews and Conn for sexual discrimination against the City, Tucker, Liciardello, and Doyle, and for intentional infliction of emotional distress against Liciardello and Doyle. The court heard only the Title VII hostile racial and sexual environment claims against the City.

Following an eight day trial and nearly two full days of deliberation, on December 19, 1988, the jury reached its verdict. It ruled in favor of Andrews on her section 1983 claim against the City, Liciardello and Doyle, and on her intentional infliction of emotional distress claims against Liciardello and Doyle. It found for defendant in Andrews' section 1983 claims against Tucker. The jury awarded damages to Andrews against the City in the amount of $130,000, against Liciardello of $65,000, and against Doyle of $65,000. The jury ruled in favor of Conn on her section 1983 claim against the City and Liciardello and on her intentional infliction of emotional distress claim against Liciardello. It again absolved Tucker on the section 1983 claim, as it did Doyle on Conn's section 1983 and intentional infliction of emotional distress

---

**1.** Neither party contests any of these actions with the exception of the directed verdicts entered in favor of the John Doe defendant on all counts, which is contested by plaintiffs.

claims. The jury awarded damages to Conn against the City of $100,000 and against Liciardello of $35,000.

Immediately following the jury's verdict, the court made exhaustive and detailed findings of fact and conclusions of law and entered judgment in the Title VII cases in favor of the City. The court found that the plaintiffs had not complained to their superior officers about most of the conditions, such as the obscene language and pornographic pictures, and that there was insufficient evidence to show that many of the actions were directed at the plaintiffs specifically or because of their sex. It concluded that Doyle paid considerable attention to Andrews because she needed extra supervision. Furthermore, the court found that AID did respond to Andrews' problems of lost case files, and that some of them were a result of her personal disorganization. The court found no difference in the treatment accorded plaintiffs and the other officers with respect to sick checks, work loads, and work conditions. It found the IAD investigation satisfactory, and that Tucker had acted properly given the report's findings. Finally, the court held the evidence insufficient to support Andrews' charge against the City of a racially hostile environment.

These findings of fact led the court to rule that the plaintiffs were not entitled to relief under Title VII. Specifically, the court concluded that plaintiffs had not proven that "Philadelphia, through its agents or supervisory personnel knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." Further, after noting that it was a close case, the court held that "the weight of the evidence fails to support a conclusion that the actions affecting Andrews and Conn were designed to intentionally harass them because of their gender."

Following the entry of a jury verdict and the court order, the plaintiffs moved pursuant to Fed.R.Civ.P. 59(e) to have the court amend or alter its findings so as to make them consistent with the jury verdict for Conn and Andrews in the section 1983 claims. Shortly thereafter, defendants moved for judgment n.o.v. to be entered in favor of the City on the section 1983 claims and in favor of Liciardello and Doyle on both the section 1983 claims and the intentional infliction of emotional distress claims.

The district court, after painstakingly reanalyzing the relevant facts and this tumultuous area of the law, granted the City's motion for judgment n.o.v. on the section 1983 claims and Liciardello's and Doyle's motions on the intentional infliction of emotional distress claims. The court concluded that under the Supreme Court's rulings in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, any discrimination at AID did not rise to the level of an "official policy or custom" by the City because it had not been approved or promulgated by a "policymaker." As to the intentional infliction of emotional distress claims, it held that Liciardello's and Doyle's acts did not rise to the level of outrageousness necessary to support a claim for intentional infliction of emotional distress under Pennsylvania law. It decided not to grant the motion for judgment n.o.v. to Liciardello and Doyle on the section 1983 claims, holding that there was sufficient evidence for the jury to find that defendants had participated in intentional discrimination against plaintiffs because of their gender. It rejected defendants' defense of qualified immunity as well.

The trial judge also denied plaintiffs' motion to alter his judgment on the Title VII claim. He ruled that the verdicts against Liciardello and Doyle, which were the only verdicts remaining after the judgments n.o.v., were not sufficient to prove a "hostile environment" claim, given the differing standards under Title VII and section 1983. The court stated, "A finding that Liciardello and Doyle sexually discriminated against Andrews and Conn in violation of the equal protection clause does not, in and of itself, translate into a finding that AID was a sexually hostile working environment." In a footnote, the court also pointed to a distinct lack of evidence of sexual advances or other conduct of a sexual nature as proof

that plaintiffs had not adequately proven a claim for a violation of Title VII because of a sexually hostile work environment.

Plaintiffs appeal the trial court's denial of their motion to amend. They argue that the jury verdicts, even the infirm verdict against the City, compel the trial court to find a Title VII violation. Additionally, they challenge the judgments n.o.v. entered in favor of the City, Liciardello, and Doyle. They argue that the jury verdict should not have been upset because Tucker had delegated policymaking power to Liciardello and because sexual discrimination at AID was a longstanding "custom." They also see no grounds for upsetting the jury's verdict on the intentional infliction of emotional distress claims. The defendants cross-appeal the trial court's failure to enter judgment n.o.v. for Liciardello and Doyle on the section 1983 claims. They again argue the insufficiency of the evidence and the application of qualified immunity.

### III.

■■■ To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986). They must demonstrate that they "receiv[ed] different treatment from that received by other individuals similarly situated." *Kuhar v. Greensburg–Salem School Dist.,* 616 F.2d 676, 677 n. 1 (3d Cir.1980). Specifically to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender. *Bohen v. City of East Chicago,* 799 F.2d 1180, 1186–87 (7th Cir.1986).

■ Supervisory liability cannot be based solely upon the doctrine of respondeat superior, but there must be some affirmative conduct by the supervisor that played a role in the discrimination. *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976). The necessary involvement can be shown in two ways, either "through allegations of personal direction or of actual knowledge and acqui-

escence," *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988), or through proof of direct discrimination by the supervisor. The existence of an order or acquiescence leading to discrimination must be pled and proven with appropriate specificity. *Id.*

In this case, Doyle and Liciardello contend that there was insufficient evidence to prove that they either acquiesced to discrimination at AID or directly participated in such discrimination. They claim that there were no complaints regarding most of the alleged harassment, and as to such complaints the plaintiffs did make, the complaints received attention in an appropriate manner. Additionally, Doyle and Liciardello answer that they should be sheltered from liability by their qualified immunity as municipal officials. Thus, they argue that the trial court erred in denying their motion for judgment n.o.v.

First, given the jury verdict in favor of the plaintiffs on their section 1983 claims, we must view the evidence in the light most favorable to them, giving them the benefit of all reasonable inferences that the jury might have drawn to support its verdict. *Firemen's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). This court is hesitant to upset a trial court's decision to deny a motion for judgment n.o.v. because reversing the denial of the motion implicates the decision of not only the trial court, but also the verdict of the jury. Thus, we must affirm the judgment "unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Link v. Mercedes–Benz of North America,* 788 F.2d 918, 921 (3d Cir.1986) (citation omitted). In this case, giving the plaintiffs the benefit of all inferences of fact, as we are required to do, we conclude that there is "the minimum quantum of evidence" present to sustain the verdicts against both Liciardello and Doyle.

■ The verdict against Doyle can be sustained on one of two grounds. There is evidence that he personally participated in

the harassment of Andrews. The jury reasonably could have found that Doyle spent an inordinate amount of time with Andrews to satisfy his personal rather than his official interests. Such a finding is supported by Mitchell's and Andrews' testimony, including Andrews' testimony that Doyle questioned her concerning her social life and also described his own personal life to her. Though defendants contend that this extra attention was simply Doyle's way of doing his job, Andrews testified that he was "coming on" to her. The jury could reasonably have perceived these actions of her superior as sexual harassment.

There is also evidence that Doyle condoned the actions of Andrews' male colleagues. It is evident, given his testimony and that of others, that he was aware of the foul name calling directed to Andrews and the pornographic pictures. The name calling was so pervasive and the terms used were so outrageous, that it would be incomprehensible for Doyle, who was present in and charged with supervising the squad room, not to have noticed. Similarly, the excessively lewd pictures were in clear view, and it would be impossible for Doyle to contend that he overlooked the pornographic displays. Doyle also did very little to remedy the missing case files problem. Although he did devise a flow chart system, there is no evidence that he ever tried to find out why the cases were missing or who might have taken them. Given his position as squad supervisor, frequent recurrences of missing case files and the grave consequences flowing therefrom, the jury reasonably could have determined that Doyle's failure to investigate the source of the problem implicitly encouraged squad members to continue in their abuse of Andrews.

■ The evidence against Liciardello, with respect to both Andrews and Conn, although insufficient to prove direct discrimination, does suffice to support a finding that he acquiesced to it. There is evidence that Liciardello was aware of the problems concerning foul language and pornographic materials but did nothing to stop them. The language and the pictures were so offensive and regular that they could not have gone unnoticed by the man who was ultimately responsible for the conduct of the Division. He took no measures to investigate the missing case problems which Conn and Andrews, but none of the male officers, suffered. Additionally, he provided an important insight to his personal "boys will be boys attitude" toward sex-based harassment when he cautioned Conn, "You have to expect this working with the guys." Based upon this disposition and his failure to have investigated many of the claims brought by the women, a jury could have reasonably concluded that Liciardello acquiesced in the sexual discrimination against Andrews and Conn.

■ Liciardello and Doyle's contention that they are protected by qualified immunity also misses the mark. A public official's actions are protected by qualified immunity if s/he can show that the "offending" conduct did not "violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Defendants contend that it was not clear that their conduct was discriminatory, and thus they are protected by their immunity.

Liciardello and Doyle's interpretation of *Harlow* is somewhat mistaken. The general right which the jury found them to have violated, the right to be free of discrimination based upon sex in the workplace, was well grounded in law and widely known to the public by 1986, the beginning of the scenario for this lawsuit. By finding against Liciardello and Doyle, the jury found that they had either intentionally or recklessly violated that right.

Given this state of mind requirement and the well known underlying general legal principle, it is evident that the defendants knew that tolerating or engaging in disparate treatment of plaintiffs in the workplace on the basis of their sex was a violation of plaintiffs' rights. Although there may not have been any precedents with precisely analogous facts it is sufficiently clear that by allowing the harassment of Andrews

and Conn to continue, and possibly even participating directly in that harassment, a "reasonable official would understand that what he is doing violates their rights." *Ryan v. Burlington County*, 860 F.2d 1199, 1208 (3d Cir.1988), *cert. denied sub nom. Fauver v. Ryan*, — U.S. —, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989) (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1988)).

To this extent, it appears that Liciardello and Doyle are attempting to argue that because this is a close case as to whether they had the necessary discriminatory intent or took any discriminatory actions, they should receive the benefit of the doubt. This is not the purpose of qualified immunity. The purpose is to protect public officials from liability in situations involving extraordinary circumstances and where they neither knew nor objectively should have known the appropriate legal standard. *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738. We are constrained to hold that Liciardello and Doyle objectively should have known the applicable legal standard, and thus are not protected by qualified immunity in treating, or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment.

## IV.

■ The trial court granted judgment n.o.v. in favor of the City on the section 1983 claims, ruling that "no reasonable jury could conclude that it was the policy or custom of the Police Department to discriminate against female police officers or to fail to take appropriate action when complaints of sexual discrimination or harassment were made by female police officers." The court held that there was insufficient evidence to link the discrimination to a city policymaker, specifically Police Commissioner Tucker, and that Tucker had not abdicated nor delegated his authority. Thus, the court held that the discrimination alleged did not result from a city policy as required by *Monell* and its progeny.

■ In reviewing a decision to grant judgment n.o.v. we must "view the evidence in the light most favorable to the party secur[ing] the verdict, drawing all reasonable inferences that the jury might have drawn to support its decision." *Rich v. United States*, 596 F.2d 541, 544 n. 4 (3d Cir.1979) (citation omitted). In this case, given the jury verdict in favor of Tucker, the lowest level policymaker implicated, the jury's verdict against the City is not consistent with the law nor the evidence.

A government entity may not be held liable under section 1983 under the respondeat superior doctrine. To obtain a judgment against a municipality, a plaintiff must prove that the municipality itself supported the violation of rights alleged. *Monell*, 436 U.S. at 692–95, 98 S.Ct. at 2036–38. Thus, section 1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. at 2037.

A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). *Accord Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384.

In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom. As the Supreme Court most recently stated in *Jett v. Dallas Independent School District*, — U.S. —, —, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (emphasis in original and citations omitted),

[I]t is for the jury to determine whether *their* [policymakers'] decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.

Thus, even in "custom" type cases, it is impossible on the delivery of a kick to inculpate the head and find no fault with the foot. This is exactly the course the jury took when they found the City liable and exculpated Tucker, a policymaker.

The question of who is a "policymaker" is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 142, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action. As the Court observed in *Praprotnik*:

When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

*Id.* at 127, 108 S.Ct. at 926 (emphasis in original).

In this case, Tucker, as Police Commissioner was a policymaker. He had promulgated and disseminated a police department training manual and a course outline explaining the prohibitions against sexual harassment and discrimination. Bulletins and regulations were issued outlining the duties of police officers with respect thereto and implementing city and departmental anti-discrimination policy. He also set up a

division, the Equal Employment Office, to deal with problems of discrimination and he personally reviewed the IAD report issued in this case. Thus, the evidence demonstrates unequivocally that, at the least, Tucker "retained the authority to measure" Liciardello and Doyle's conduct.

Given that Tucker was the official policymaker in this case, the City can be held liable only if Tucker either acquiesced in Liciardello's decisions or delegated his authority to him. In terms of delegation, the issuance of policy statements, conducting an investigation, and taking some remedial steps show that Tucker did not delegate his responsibility. If there had been a complete delegation of authority, IAD and Tucker would have never gotten involved in this case. Also, Tucker's testimony that he assigned two women to AID following the IAD investigation with the intent to "send a clear warning" shows that he retained the ultimate control. Although it is conceded that Liciardello did control AID on a day to day basis, ultimately he was answerable in all of his decisions to Tucker.[2]

The second means of holding the municipality liable is if Tucker knowingly acquiesced to the decisions made at AID. As noted in *Praprotnik*, "If the authorized policymakers approve a subordinate's decision *and the basis for it*, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127, 108 S.Ct. at 926 (emphasis added). Here, although Tucker reviewed the decision made by AID with respect to plaintiffs' complaints, he personally did not observe or acquiesce in any sexual harassment, and he was not convinced that the AID decisions were motivated by sexual animus, as determined by the jury. Thus, he did not knowingly acquiesce to departmental sexual discrimination.

THE COURT: And for that you look to Tucker?
COUNSEL: I think, yeh, initially you would look to Tucker for that.

---

**2.** Plaintiffs' counsel admitted at oral argument that Tucker is the key figure in the action against the City:
COUNSEL: It is attributable to the City where you can show his policies were ... in effect ratified with deliberate indifference to what went on in this unit.

The jury, through its verdict, determined that sexual animus influenced Liciardello's decisions, but that sexism did not motivate Tucker's official behavior in any way. We can assume that if the jury had been convinced that Tucker acquiesced to Liciardello's discrimination they would have found him personally liable. Thus, the jury was unconvinced that Tucker ordered the IAD investigation as a mere coverup, or that he was attempting to sweep these incidents under the table. Tucker took prompt action with respect to the complaints which involved incidents which occurred during a relatively short period of time. Thus, the jury verdict in favor of Tucker makes acquiescence an untenable theory. This is not a case where there was a longstanding practice which was completely ignored by the policymaker who was absolved by the jury. Because Tucker did not authorize or acquiesce in the conduct which constituted sexual discrimination, the City may not be held liable for that discrimination under section 1983. Thus, the district court's considered decision to grant judgment n.o.v. on this claim must be affirmed.

### V.

Plaintiffs also challenge the trial court's decision in favor of the City on the Title VII claim and the later denial of their motion to alter that decision. Plaintiffs contend that the decision is not properly grounded in the law because it too narrowly defines sexual harassment, and that it is impermissibly inconsistent with the jury's verdict in the 1983 claim.

The jurisprudence of "hostile working environment" claims is newly emerging, and its contours still remain to be defined. This uncertainty in the law made the trial judge's task of sorting out the issues in these complex cases extremely difficult and regrettably led to some error. Title VII provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e–2(a) (West 1981). A plaintiff who claims that she has been sexually harassed has a cause of action under Title VII if the sexual harassment was either a *quid pro quo* arrangement, or if the harassment was so pervasive that it had the effect of creating an intimidating, hostile, or offensive work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Plaintiffs here attempt to make out a "hostile work environment" claim by showing that the AID squad room was so heavily charged with sexism that it was intimidating, hostile, and offensive.

■ To bring an actionable claim for sexual harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee." *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989) (emphasis in original). We hold that five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII: (1) the employees suffered intentional discrimination because of their sex;[3] (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Cf. Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–20 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

**3.** The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course. A more fact intensive analysis will be necessary where the actions are not sexual by their very nature.

It is particularly important to note that these factors include both a subjective standard (No. 3) and an objective standard (No. 4). The subjective factor is crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief. The objective factor, however, is the more critical for it is here that the finder of fact must actually determine whether the work environment is sexually hostile. Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women. Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L.Rev. 1449, 1455 (1984) (hereinafter *Sexual Harassment Claims* ). Congress expected that Title VII would result in the "removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Such an objective can only be achieved if women are allowed to work without being harassed. Women who know that they will be subject to harassment will be deterred from joining the work force or accepting certain jobs. The objective standard protects the employer from the "hypersensitive" employee, but still serves the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment.

In applying these factors to this case, it becomes clear that the trial court was mistaken, though understandably, in its analysis of this claim. In terms of the first factor, intentional discrimination, the trial court found that "the weight of the evidence fails to support a conclusion that the actions affecting Andrews and Conn were designed to intentionally harass them because of their gender." This finding, however, is impermissibly inconsistent with the jury's verdict.

In *Roebuck v. Drexel University,* 852 F.2d 715, 717 (3d Cir.1988), we stated that we should follow the great weight of authority in other circuits that apply the principles of collateral estoppel and jury supremacy to preclude a trial court from entering a judgment on a Title VII claim at variance with the jury's findings in a concurrently tried section 1983 claim. We reached this conclusion because we believed that a trial judge "should not be allowed to ignore a considered decision of a jury merely because the judge views the issues differently, or otherwise the seventh amendment right to a jury trial would be significantly attenuated." *Id.* at 737. Thus, in all issues which are common to a claim tried simultaneously to the bench and to a jury, the court is bound by the jury's findings.[4] In this case, the jury decided, in both its verdict against Liciardello and Doyle and in the verdict against the City,[5]

4. Counsel, and even to a certain extent the court, discussed the issue of jury supremacy in absolute terms. Plaintiffs contend that the section 1983 verdicts, alone and without further expansion, compelled a favorable verdict in the Title VII case. Defendants, on the other hand, argue that Title VII and section 1983 are different causes of actions with different levels of proof; thus, the concept of jury supremacy was inapplicable. Both sides are correct in one way, but incorrect in another. Section 1983 and Title VII claims are complex actions with different elements. Proof of some of these elements, particularly discrimination based upon sex and subjective harm is identical, and thus the court should be bound by the jury's determination on these issues. Other elements, particularly the objective element of the Title VII claim, are uniquely Title VII elements, and although the judge's decision here may be affected by certain

findings of the jury, they are ultimately a decision of the court.

5. We recognize that we are giving some degree of preclusive effect to a jury verdict which the trial judge determined, and we agreed, to be infirm. We understand that in certain cases giving preclusive effect to an infirm verdict would result in the concept of jury supremacy being "stretched to the breaking point." *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 458 n. 4 (4th Cir.1989). But, in this case the jury verdict against Philadelphia was found to be infirm on very narrow grounds, the lack of respondeat superior liability in section 1983 claims. The integrity of the jury's conclusions concerning the environment at AID, particularly the presence of pervasive sexual discrimination is unaffected by judgment n.o.v., and thus

that these defendants subjected Andrews and Conn to discrimination because of their sex. Under *Roebuck*, the trial court is bound by this determination. Likewise, here the jury verdict compels a finding that harassment in the work environment at AID was pervasive and regular. Harassment is pervasive when "incidents of harassment occur either in concert or with regularity." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987). The verdict against Liciardello, *see supra*, is supported by evidence that there were regular and frequent incidents of harassment and that he condoned this behavior. If the discrimination were sporadic, it would be nearly impossible to sustain a jury verdict against a supervisor on an acquiescence theory.

Similarly, the verdict against the City connotes that the jury found the environment at AID to be discriminatory. If there were just a handful of isolated incidents, it would have been impossible to hold the City liable, because the jury was instructed to find liability only if they found a policy or a custom. Though we agree that this "policy or custom" was not ratified or promulgated by a policymaker, this does not diminish the jury's determination that a regular practice of discrimination prevailed at AID.

The presence of the third factor, the detrimental effect upon the employee, is evidenced by the jury verdict that awarded damages to the plaintiffs. Defendants essentially never contested that plaintiffs had suffered some damage. Working conditions forced Conn to resign from AID and the police force, Andrews was burned, and both suffered from emotional trauma. The only question to be decided concerning this element is whether these injuries resulted from discriminatory conduct or something else. The jury verdict answers this question.

The fourth factor, objectively whether sexual hostility pervaded AID, is the most troublesome. The jury was not called upon directly to answer this question, because it only needed to find discrimination and

harm to award a verdict on the section 1983 claim. Thus, it is largely up to the court to make the factual findings with respect to this claim. The trial court here determined that the work environment at AID was not sexually hostile, and thus found for the City. In reaching this decision, we believe the court applied an overly restrictive interpretation of the hostile work environment concept.

The trial court recognized that a decision regarding hostile work environment should be made viewing the totality of the circumstances, but somewhat misapplied the concept. Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. As the Court of Appeals for the Eleventh Circuit noted, the factfinder in this type of case should not "necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." *Vance*, 863 F.2d at 1510. The factfinder must not only look to the frequency of the incidents but to their gravity as well.

In this case, there are many close calls and uncertainties. It is not clear why Andrews' case files were disappearing or who burned her. It is not clear why Conn's case files disappeared, or why a particular case file eventually reappeared in her briefcase after she had previously checked it. It is not clear who made the anonymous phone calls or how plaintiffs' automobiles were vandalized. In facing this vexing situation, the trial court examined incident by incident and determined that in many instances there just were no answers. For instance, the judge never really determined who put the lime in Andrews' shirt or why her files were disappearing, although he

should be respected by the court in reaching its decision on the Title VII claim.

credited some but not all of the lost case files to her own disorganization. This appears to be somewhat less than the totality analysis that is required. It also seems to incorrectly ignore the jury's finding of intentional discrimination. The court needs to do more than make findings with respect to each incident; an examination of the totality of the circumstances requires a determination of whether the incidents were happening to these female police officers, and why to no one else.

■■■ We believe that the trial court also too narrowly construed what type of conduct can constitute sexual harassment. Great emphasis is put on the lack of sexual advances, innuendo, or contact. In the court's opinion issued pursuant to the denial of the motion to alter judgment, the court supports its finding that "evidence is extremely minimal and would not, standing alone, support a finding of a sexually hostile work environment," noting the lack of evidence of direct sexual harassment. To the extent that the court ruled that overt sexual harassment is necessary to establish a sexually hostile environment, we are constrained to disagree.

■■■ To make out a case under Title VII it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'" *Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1047 n. 4 (3d Cir.1977) (citation omitted). To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee. "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988); *see McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987). The Supreme Court's ruling in *Vinson* appears to support this proposition as well, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." 477 U.S. at 65, 106 S.Ct. at 2404. The Supreme Court in no way limited this concept to intimidation or ridicule of an explicitly sexual nature.[6]

■■■ More specifically, we hold that the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment. *See Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983); *Hall*, 842 F.2d at 1012–15; *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 903 (1st Cir.1988); *Ways v. City of Lincoln*, 871 F.2d 750, 754–55 (8th Cir. 1989) (racial epithets found to be a factor in creating a racially hostile work environment). Similarly, so may the posting of pornographic pictures in common areas and in the plaintiffs' personal work spaces. *See Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988) *mot. denied*, —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1988); *but see Rabidue*, 805 F.2d 611. Obscene language and pornography quite possibly could be regarded as "highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the

---

**6.** The district court may have been misled by the EEOC Guideline concerning sexual harassment, 29 C.F.R. § 1604.11 (1988). The guideline states:

> Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

We read the first sentence, that harassment based on sex is a violation of Title VII, to be the general concept, and the second sentence as merely an illustration of how explicit sexual conduct could rise to this level. But, if the second sentence were read to modify the first, it would seem to imply that only explicit sexual harassment would be actionable. This reading does not appear to be consistent with either the wording of the EEOC guideline or the prevailing case law.

barrier of sexual differentiation and abuse." *Bennett,* 845 F.2d at 106. Although men may find these actions harmless and innocent, it is highly possible that women may feel otherwise. *Sexual Harassment Claims* at 1451.

Although defendants' counsel vigorously argues that a police station need not be run like a day care center, it should not, however, have the ambience of a nineteenth century military barracks. We realize that it is unrealistic to hold an employer accountable for every isolated incident of sexism, however, we do not consider it an unfair burden of an employer of both genders to take measures to prevent an atmosphere of sexism to pervade the workplace.

> [W]hile Title VII does not require that an employer fire all "Archie Bunkers" in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers. By informing people that the expression of racist or sexist attitudes in public is unacceptable, people may eventually learn that such views are undesirable in private, as well. Thus, Title VII may advance the goal of eliminating prejudices and biases in our society.

*Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 350 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *see Sexual Harassment Claims* at 1451.

Thus, in reconsidering this factor on remand, the trial judge should look at all of the incidents to see if they produce a work environment hostile and offensive to women of reasonable sensibilities. The evidence in this case includes not only name calling, pornography, displaying sexual objects on desks, but also the recurrent disappearance of plaintiffs' case files and work product, anonymous phone calls, and destruction of other property. The court should view this evidence in its totality, as described above, and then reach a determination.

▮ The final factor in a "hostile work environment" claim is respondeat superior.

In determining whether an employer is liable for a sexually hostile environment, we are instructed to "look to agency principles for guidance in this area." *Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408. According to these principles, "liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989); *see Hicks v. Gates Rubber* at 1418. Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable. *Katz v. Dole,* 709 F.2d at 255.

In this case, at least according to the jury verdict, "middle management" of the police department was aware of the problem, and acquiesced in the discrimination. This places a high burden upon the City to show that the City or its acknowledged middle management employees, Liciardello and Doyle, took prompt and adequate remedial action. "Where, as here, the employer's supervisory personnel manifested unmistakable acquiescence in or approval of the harassment, the burden on the employer seeking to avoid liability is especially high." *Id.* at 256. The City must demonstrate that its supervisory employees investigated plaintiffs' complaints and took appropriate action to adequately curb the sexism at AID.

## VI.

Plaintiffs also challenge the trial court's decision to grant judgment n.o.v. for defendants on the intentional infliction of emotional distress claims. The jury had previously found for Andrews against Liciardello and Doyle and for Conn against Liciardello on these claims.

▮ The claim for intentional infliction of emotional distress is a state tort and is here governed by Pennsylvania substantive law; however, Pennsylvania courts have applied the law cautiously. To prove such a claim it is necessary to demonstrate that

the conduct complained of is extreme or clearly outrageous. *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir.1988); *see also Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979).[7] It is the court's responsibility to determine if the conduct alleged in a cause of action reaches the requisite level of outrageousness. *Cox*, 861 F.2d at 395. We agree with the trial court's decision that the actions taken by Liciardello and Doyle did not rise to such a level.

As this court observed in *Cox*, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.* In this case, many of the incidents of alleged harassment by Doyle and Liciardello were work related, for example, the sick checks which Conn viewed to be harassment and Doyle's failure to take Andrews "off the wheel," as well as the verbal reprimands that both plaintiffs received and of which they complained.

Also, as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress. As we noted in *Cox*, 861 F.2d at 395–96, "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *See, e.g., Bowersox v. P.H. Glatfelter Co.*, 677 F.Supp. 307, 311 (M.D.Pa.1988). The extra factor that is generally required is retaliation for turning down sexual propositions. *See id.* at 310 and cases cited therein. In this case, there is only one contention of direct sexual propositioning, the propositioning of Conn by Stock, and that was confessed to be a minor incident in which Liciardello played no role. Thus,

this case, particularly the claims made by Andrews, who was never propositioned, is different from those cases where sexual harassment made out a claim for intentional infliction of emotional distress.

In this context we cannot say that the district court erred in holding Liciardello's or Doyle's actions with respect to plaintiffs did not rise to the level of outrageousness required under Pennsylvania law. Although we agree that some of the actions alleged might form a basis for this tort, most specifically the covering of Andrews' shirt with lime, there was no proof that any of these were perpetrated directly or indirectly by Liciardello or Doyle. They should not be held accountable for each individual incident regardless of their lack of participation. Their acts of acquiescence may have contributed to the general environment at AID, but it cannot be said that they personally encouraged, endorsed, or sponsored every incident. Thus, the court's entry of judgment n.o.v. for the defendants on this claim will be affirmed.

The jury awards to plaintiffs reflected a combined award for both the intentional infliction of emotional distress and section 1983 claims. Thus, because we have affirmed the judgment n.o.v. on the intentional infliction of emotional distress claims, the case will be remanded for a new trial on the issue of damages on the section 1983 claims.

## VII.

The final issue on appeal is the trial court's grant of a directed verdict in favor of the John Doe defendant. Plaintiffs argue that John Doe was a crucial party to their claim because he represented the anonymous policemen who had done much of the actual harassing. Plaintiffs fail to satisfactorily explain their grounds for appeal as to John Doe, or the alleged

---

**7.** We recognize that recent decisions of the Pennsylvania Supreme Court, *see Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988, 988–89 & n. 2 (1987), and other courts in Pennsylvania, *see Ford v. Isdaner*, 374 Pa.Super. 40, 542 A.2d 137, 139, *allocatur denied*, 520 Pa. 617, 554 A.2d 509 (1988), call this court's recognition of the tort of intentional infliction of emotional distress under Pennsylvania law into question. Even assuming for the purpose of our discussion that the tort exists, plaintiffs have failed to make out a proper claim.

basis of liability, and we are largely left to conjecture in dealing with this issue.

Plaintiffs contend at trial that "by bringing the John Doe defendants, that creates liability for the Police Department and/or the supervisory officials in the chain of command of those John Doe officers who allowed them to run amok." As a practical matter this would allow plaintiffs to essentially bring two identical causes of action against the same parties. It would also allow plaintiffs to circumvent the strictures of respondeat superior liability, including the lack of respondeat superior liability under section 1983. The district court rejected such a tactic and we agree.

Rejecting plaintiffs' claims against the John Doe defendants is not unjust. Plaintiffs had ample opportunity to make cases out against the true parties in interest, and in at least two cases will receive judgments. By allowing the John Doe claims here, we would be sanctioning the absurd result that plaintiffs could file cases against John Doe co-workers, even where the harassing co-worker is not anonymous, in an effort to gain recovery from a deep pocket. This would allow plaintiffs to avoid the strictures of respondeat superior theory. Such a result is unwarranted. This is not to say, though, that we would harbor the same view when a John Doe claim is brought with the expectation of later finding the responsible culprits and substituting them as parties. Once it became apparent, however, that John Doe would remain anonymous, the district court properly directed a verdict in favor of the John Doe defendants.

## VIII.

Accordingly, the judgment of the district court will be affirmed in all respects, except as to the remand for a new trial on the issue of damages on the section 1983 claims and as to the claims under Title VII. The judgment on the Title VII claims will be vacated and the case remanded for further consideration consistent with this opinion based upon the record as presently constituted and such additional evidence as the district court may deem appropriate.

Costs taxed against the defendants, the City of Philadelphia, Joseph Liciardello, and Frank Doyle.

