NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3876

_____

BROOKE R. GRASSMYER; PATRICIA A. MCGRANE;
LYNNE A. RYAN,

Appellants,

v.

SHRED-IT USA, INC.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cv-098)
District Judge:  Honorable Kim R. Gibson

_____

Argued: July 14, 2010

Before:   RENDELL, JORDAN, and GREENAWAY, JR., *Circuit Judges*.

(Filed : August 25, 2010)

_____

Stephen D. Wicks   [ARGUED]
109 Lakemont Park Blvd.
Altoona, PA   16602
        *Counsel for Appellants*

Christopher J. Davis
Sherrard, German & Kelly
620 Liberty Avenue - 28th Fl.
Pittsburgh, PA   15222

Gregory G. Pinski   [ARGUED]
Conner & Pinski
520 Third Avenue North
P.O. Box 3028
Great Falls, MT   59403
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Lynn Ryan, Patricia McGrane, and Brooke Grassmyer (collectively the "Plaintiffs") appeal from an order of the United States District Court for the Western District of Pennsylvania granting summary judgment in favor of Plaintiffs' former employer Shred-It USA, Inc. ("Shred-It") with respect to Plaintiffs' claims of gender discrimination and Ryan's and McGrane's claim that they were subjected to a hostile work environment, all having been brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 et seq.  For the reasons that follow, we will affirm the District Court's order with respect to Ryan's and McGrane's hostile work environment claim and Grassmyer's gender discrimination claim, but will vacate with respect to Ryan's and McGrane's gender discrimination claims.

I.    **Factual Background**

Shred-It is a company that provides two types of document destruction services: an ongoing "automatic" service at intervals specified by the customer and a one-time

"purge" service. To sell its services, Shred-It employs sales representatives who are assigned to various sales territories and tasked with developing and maintaining clients. Plaintiffs were all employed as sales representatives in Shred-It's Pittsburgh, Pennsylvania office. Ryan was employed from May 2, 2005 until September 9, 2005, when she was terminated for failing to meet sales quotas. McGrane was employed from February 1, 2005 until January 13, 2006, when she was terminated for failing to meet sales quotas. Grassmyer was employed from May 23, 2005 until January 25, 2006, when she voluntarily resigned. All of the Plaintiffs' positions were ultimately filled with male sales representatives.

During Plaintiffs' employment, Gino Laspina was Shred-It's general manager, and Kevin Mitchell and David Vaniel were Shred-It's sales representative supervisors. Shred-It also employed the following seven male sales representatives during Plaintiffs' employment at Shred-It: Dana Stephens; David Vaniel;[1] Larry Bowser; Jack Papson; David Peters; Nick Pavlecic; and Dennis Milavec. Of the seven male sales representatives, only Peters was terminated. However, of the eleven sales representatives Shred-It has terminated over the last five years for failing to meet the sales quotas, seven were male and four were female.

---

[1]Vaniel began working at Shred-It as a sales representative and was later promoted to sales representative supervisor.

3

Plaintiffs do not dispute that they failed to meet the sales quotas established by Shred-It. Their claims are based upon the allegedly discriminatory manner in which Shred-It enforced its sales quotas, trained sales representatives, and assigned sales territories, and based on an overall "men's club" atmosphere on the job. For their hostile work environment claim, Ryan and McGrane point particularly to comments made by Mitchell that they describe as sexually explicit, profane, and vulgar. The factual allegations underlying the Plaintiffs' claims are discussed in greater detail below.

A.      *Enforcement of Quotas*

Shred-It's sales representatives were required to achieve the following sales targets: 10 appointments per week, 10 new automatic clients per week, $1,190 of automatic revenue per month, 50 cold calls per week, 150 teleprospecting calls per week, 5 referrals per week, and 5 client care calls per week. "Automatic clients" are those who sign up for automatic service at specified intervals, and their accounts generate "automatic revenue." New automatic revenue sales were the key business indicator and standard of success for sales representatives at Shred-It.

i.      *Plaintiffs' Performance and Treatment*

Ryan began working at Shred-It on May 2, 2005. On July 19, 2005, having generated approximately $250 of new automatic revenue during her first two and one-half months on the job, Ryan received a written warning, indicating that she needed to improve her performance. She was also placed on a Performance Action Plan ("PAP"),

4

which specified certain sales goals and the dates by which she was required to accomplish them. On September 9, 2005, just four months after she began working at Shred-It, Ryan was terminated for failing to meet the specified sales requirements. At the time of her termination, Ryan had sold $956 in automatic revenue (approximately $36.76 per week).

McGrane began working at Shred-It on February 1, 2005. On September 9, 2005, Shred-It provided McGrane with a performance evaluation, indicating that she was not meeting her sales quota. At the time, McGrane had been working at Shred-It for approximately eight months and had sold $1,940 in new automatic revenue. On December 20, 2005, Laspina met with McGrane to discuss her performance, and Vaniel later provided her with another written warning, which detailed her sales performance deficiencies and placed her on a PAP. McGrane's PAP required her to meet certain goals over the next two weeks, notwithstanding the fact that December is, according to McGrane, a slow sales period for Shred-It's services, given the end-of-year holiday season.

After failing to meet the requirements identified in the December 20, 2005 written warning and PAP, McGrane received another written warning on January 9, 2006, instructing her to meet the required sales numbers by January 13, 2006 and informing her that she would be terminated if she failed to achieve the specified sales requirements by that date. On January 13, 2006, having not satisfied the requirements identified in the December 20, 2005 and January 9, 2006 written warnings, McGrane was terminated. At

5

the time of her termination, McGrane had sold $3,762 in new automatic revenue (approximately $85.50 per week).

Grassmyer began working at Shred-It on May 23, 2005.  On October 10, 2005, she received a performance evaluation notifying her that she had not satisfied the sales quota for new automatic revenue.  Grassmyer quit her job at Shred-It on January 25, 2006.  She claims that she had no choice but to quit because her working conditions had become intolerable, specifically because Shred-It had advertised a sales position on the internet that covered her territory and she had received emails that were negative and aggressive, and also because McGrane had recently been terminated.  However, Grassmyer concedes that she was never told that she would be terminated.  She also concedes that the allegedly negative and aggressive emails she received, which focused on increasing sales performance, were sent to all sales representatives and were gender neutral, except for the use of the word "team," which she believes to have a male connotation.

After leaving Shred-It, Grassmyer accepted a position with Laurel Medical Supplies, which paid a higher salary.  During her deposition, Grassmyer testified that she did not contact her new employer or contemplate leaving Shred-It until January 20, 2006, when she saw that her sales territory was being advertised on the internet.  However, personnel records from Laurel Medical Supplies indicate that Grassmyer contacted Laurel Medical Supplies on December 30, 2005 and interviewed with the company on January 5, 2006.

ii. *Male Sales Representatives*

Plaintiffs point to the performance of male sales representatives Bowser, Papson, and Pavlecic, in support of their allegation that Shred-It applied the sales quotas unevenly to men and women. Bowser worked as a sales representative at Shred-It from July 18, 2005 until August 28, 2006, when he voluntarily resigned his position at Shred-It to accept a job with another company. During his first three months at Shred-It, Bowser generated no automatic revenue. But, unlike Ryan, who received a written warning and PAP for failing to meet the sales quota after working at Shred-It for only two and one-half months and generating $250 in new automatic revenue, Bowser did not receive any such warnings about his performance and was not placed on a PAP. In 2005, Bowser generated a total of $3,781 in new automatic revenue (approximately $164 per week).

Pavelecic worked as a sales representative at Shred-It from July 18, 2005 until October 2, 2006, when he voluntarily resigned. Pavelecic acknowledges that, like the Plaintiffs, he was not meeting his sales quota and should have therefore been given a PAP. However, Pavelecic was not placed on a PAP, despite his poor sales performance. In 2005, Pavelecic generated a total of $659 in new automatic revenue (approximately $28.65 per week).

Papson worked as a sales representative at Shred-It from March 21, 2005 until February 21, 2006. Like the Plaintiffs, Papson also was not meeting his performance requirements. Shred-It claims that Papson resigned under the threat of termination for

7

poor sales performance after receiving a written warning. However, Papson testified at his deposition that he did not recall receiving a written warning or being threatened with termination due to his poor sales performance, though he believes that he may have been warned informally at some point. He also testified that he left Shred-It of his own accord for financial reasons. In 2005, Papson generated a total of $3,412 in new automatic revenue (approximately $83.21 per week).

B.    *Training*

Training at Shred-It consisted of (1) taking the sales representative training program during the first week of employment, which included video and online training, (2) working in the field with supervisors, and, for some, (3) attending an Advanced Sales Training program ("AST") in Toronto. Plaintiffs do not dispute that they received equal training during the one-week sales representative training program. Rather, they allege that Shred-It discriminated against them with regard to field training and the AST.

During a "ride-along," sales representatives were accompanied in the field throughout the day by either Mitchell or Vaniel. As Vaniel stated, the purpose of a ride-along is to "[r]ide with [the sales representatives], see if there is any issues that they're having, any problems that they're facing, and also to see if there is any help that they need as far as .. coaching ... [and] how they're actually doing their presentations and going through the sales process." (App. at 564-65.) Laspina decided how many ride-alongs each sales representative would receive, while the sales supervisors, Mitchell and Vaniel,

8

decided between themselves which sales representatives they would accompany. The protocol for ride-alongs was for each sales representative to be given one ride-along per month. More time was spent with new sales representatives.

Laspina directed six ride-alongs for male sales representative Milavec during his first month as a sales representative at Shred-It. In contrast, McGrane never received more than two ride-alongs in any given month. She also claims that Mitchell failed to attend scheduled ride-alongs with her on two occasions and that, on two other occasions, he showed up but then cut the ride-along short. McGrane and Grassmyer both claim that Vaniel also failed to attend scheduled ride-alongs with them and that, when he did attend ride-alongs, he failed to provide them with feedback.

Ryan was supposed to be trained by Mitchell. However, she claims that during her time at Shred-It, Mitchell accompanied her in the field only twice and that, despite her repeated requests for training and assistance, her last ride-along took place on June 22, 2005, approximately two and one-half months prior to her termination. Ryan claims that on at least five occasions, she requested assistance and training from Mitchell and was denied, and that Mitchell frequently cancelled their scheduled meetings with little or no notice, for reasons such as being "too hung over." (App. at 770.)

Laspina did not recall any of the male sales representatives complaining that Mitchell or Vaniel had failed to conduct ride-alongs with them. Nor could male sales representatives Bowser, Pavlecic, or Peters recall ever having such problems. Further, in

addition to the ride-alongs, Bowser was permitted to shadow Stephens (who had become a top-selling sales representative) and Vaniel on several of their sales calls. Mitchell also permitted Bowser to shadow him on several of Mitchell's appointments, and accompanied Bowser to several of Bowser's appointments when Bowser first started working at Shred-It. Plaintiffs claim that they were not allowed to shadow Vaniel, Stephens, or Mitchell on sales calls.

Moreover, unlike their female counterparts, the male sales representatives felt that they were given valuable feedback during their training sessions, and that it helped them learn the business and become better sales representatives. Milavec stated that "[Vaniel] would really do a wonderful job, and ... was able to look through his knowledge and somehow give some different angles on being able to close a sale." (App. at 581.) Likewise, Bowser stated that Vaniel's training "really helped me learn the business and what to do." (App. at 719-20.)

Regarding AST, Laspina said it was "quite costly" and he "let [the sales representatives] know that unless ... you are selling new auto revenue to justify that type of training and the cost that we, we wouldn't be sending everybody." (App. at 520.) While none of the Plaintiffs were selected to attend the AST, two male sales representatives were: Vaniel (who was a sales representative at the time and later promoted to sales manager) and Stephens. McGrane claims that Mitchell originally told her that she had been selected to attend AST in September 2005 and that, during a general

10

sales meeting, Mitchell announced that McGrane and Vaniel would both be attending AST together in October or November 2005. According to McGrane, Vaniel then asked, "Do we have to go together? Can I trade with someone else?" (App. at 754.) Shred-It subsequently sent Vaniel to AST but declined to send McGrane.

C.     *Territories*

Laspina was responsible for making territory assignments and allocations, which changed frequently, with territories expanding as sales representatives left the company and contracting as new sales representatives were hired. Plaintiffs claim that Shred-It discriminated against them on the basis of sex by failing to notify them of sales territory openings and by assigning the more desirable sales territories, such as downtown Pittsburgh, to men. Specifically, McGrane contends that her poor performance is attributable, in part, to the fact that she was not assigned to the downtown Pittsburgh sales territory, while male sales representatives who were hired after her were given portions of that territory. When McGrane was hired on February 1, 2005, she was assigned to a large geographical territory that did not include any portion of downtown Pittsburgh. When Vaniel was hired a month later, he was given a large portion of the downtown Pittsburgh territory, from which he recruited some of his biggest customers. According to Laspina, McGrane had not been considered for that territory prior to Vaniel's arrival at Shred-It because he wanted her to prove herself. When Vaniel was promoted to sales

11

representative supervisor, his downtown territory was given to Pavlecic and Milavec, both of whom began working at Shred-It after McGrane.

On or about December 12, 2005, a large portion of one of McGrane's better territories was taken from her and given to Milavec, who had recently been hired. Prior to the change and without McGrane's knowledge, Milavec was notified that he would be given that portion of McGrane's territory and told by Vaniel to "[j]ust keep it on the hush." (App. at 591.) Laspina and Vaniel offered conflicting explanations for the decision to give Milavec part of McGrane's territory. Laspina, who claims that he alone made the decision, stated that "we were not generating any income or revenue from that marketplace that I felt had a tremendous amount of opportunity, so that's the reason why I moved some zip codes around." (App. at 517.) In contrast, Vaniel claims that he and Laspina made the decision together and that it was done only for logistical reasons, not because of McGrane's poor sales performance.

Shred-It disputes the Plaintiffs' assertion that some sales territories are better than others. According to Laspina, "every territory is a good sales territory. It is what the sales representative makes of that territory." (App. at 517.) With respect to the downtown sales territory specifically, Vaniel stated that selling downtown involves "a lot of wheel-spinning and it's a lot of activity for – in my opinion, little results." (App. at 109-10.) Likewise, Pavlecic and Milavec believed that, while the downtown territory

12

may have had "more prospects," meeting the sales requirements downtown is "every bit as hard" as other areas and that "business is business." (App. at 579.)

On the other hand, Peters testified that it was easier to meet the sales requirements in the downtown territory because the "[c]oncentrated business in town [made it] easy to get around without having a lot of down time ... driving from your location to a new territory." (App. at 699.) Likewise, while at one point in his deposition, Milavec claimed that the downtown territory was no better than other territories, he later conceded that "[downtown] would be easier, because you ... could knock out a lot of your quota in just one or two days down here, versus having a territory out in Washington [County] or another area." (App. at 579-80.) Stephens also disagreed with the notion that all sales territories were equal. He testified that, when Laspina offered him a new sales territory in the Fall of 2003 shortly after being hired, he "grabbed it" because he believed that the new territory had more sales opportunities. (App. at 604-05.)

Shred-It also claims that the only reason that the Plaintiffs were not assigned to the allegedly more desirable sales territories is they never requested such territories. According to Laspina, territory openings were communicated to all sales representatives during sales meetings, and he "used to tell everybody, if a territory does open, I really look for the salesperson to take that initial step to come to me and say, hey, I really want this because I can do it." (App. at 517.) Thus, Laspina claims that the only reason that he

13

did not give any portion of the downtown territory to McGrane or Ryan is they never asked for it.

In contrast to Laspina's testimony, Plaintiffs claim that no one at Shred-It ever notified them of territory openings, or told them that they could apply for certain territories, or offered them desirable territories. With respect to the sales territory opening that was given to Stephens in the Fall of 2003, Stephens did not recall Laspina announcing the opening to all the sales representatives at a sales meeting, as Laspina claims he did whenever an opening arose, and Shred-It gave the portion of McGrane's sales territory to Milavec without notifying other sales representatives who may have been interested in the territory and without Milavec coming to Laspina and asking for the territory.

D. *"Mens' Club" Culture at Shred-It*

During his deposition, Milavec described Shred-It's culture as "sort of like a 'men's club.'" (App. at 589-90.) He explained that, in his opinion, "it was two offices, as far as the way the guys were treated and the way the girls were treated," (App. at 587), that "there were ... different sets of rules for some of the guys," (App. at 592), and that things were not quite "even Steven" among the men and the women. (*Id.*) Specifically, Milavec felt that Papson and Pavlecic were subject to a different set of rules in that they were allowed to "come and go as they pleased," (*Id.*), and that, in his opinion, Shred-It had discriminated against McGrane on the basis of her sex by taking away a portion of

14

her sales territory and giving it to him.  However, Milavec also admitted that his observations did not necessarily have "backing behind it."  (App. at 589.)

E.    *Facts Regarding Ryan's and McGrane's Hostile Work Environment Claim*

Ryan and McGrane also claim that they were subjected to sexually explicit and inappropriate comments from Mitchell.  Specifically, they allege that Mitchell regularly made comments about the size of his genitalia and about the intimate details of his sexual relationships, that he referred to women as "bitches" (App. at 503-04), that he told them of a colleague frequenting "titty bars" and getting "tanked," (App. at 772), and that he frequently used the word "fuck" in the office.  Plaintiffs also allege that, while Ryan and other sales representatives were organizing binders in the conference room of Shred-It's Pittsburgh office, Mitchell once played a compact disc on his laptop computer that included sexually explicit language, and that he once asked a male sales representative, Stephens, if he had a pubic hair stuck in his throat after Stephens had coughed during a sales meeting.

## II.    Procedural Background

Plaintiffs filed their complaint on April 27, 2007.  All of the Plaintiffs alleged that Shred-It discriminated against them on the basis of gender, with Grassmyer alleging constructive discharge.  Ryan and McGrane also alleged a hostile work environment.  On January 12, 2009, Shred-It filed its motion for summary judgment, which the District Court granted on September 4, 2009.

In analyzing Plaintiffs' gender discrimination claims, the District Court applied the three-step, burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The Court held that the Plaintiffs had established a prima facie case because they were qualified and they were all replaced with male sales representatives but that Shred-It had satisfied its burden of articulating a legitimate non-discriminatory reason for terminating the Plaintiffs, namely, that they failed to meet the sales quotas required of all sales representatives.

At the pretext stage, Plaintiffs argued that the non-discriminatory reason advanced by Shred-It was unworthy of belief because Shred-It did not terminate male sales representatives who were performing comparably or even worse than they were, applied the sales quotas unevenly among male and female sales representatives with respect to discipline and PAPs, and discriminated on the basis of sex in matters such as training, territory assignments, and performance requirements. The District Court ultimately held that no reasonable factfinder could conclude that the reasons advanced by Shred-It for its actions were pretextual.

The Court held that despite the claimed inconsistencies in enforcement of the sales quotas, the fact that, over the last five years, Shred-It had terminated seven male sales representatives and only four female sales representatives for failing to meet the sales requirements "would prevent any rational trier of fact from conceivably finding that the Plaintiffs ... were terminated because of their gender." (App. at 18.) With respect to the

16

allocation of sales territories, the Court held that, while "[w]hether downtown Pittsburgh was, in fact, an easier area to makes [sic] sales in remains a disputed question of fact," "[a] reasonable factfinder simply could not find that Plaintiffs were denied access to territories in which they could meet their sales quotas" because "Plaintiffs never requested to be moved to a better territory." (App. at 19.) Further, "[t]hat Plaintiffs were not offered a better area is not enough to show that they were set up to fail or establish pretext." (App. at 19.) Finally, with respect to training, the Court held that "[e]ven if it is assumed, taking the facts in the light most favorable to the Plaintiffs, that they received less training and assistance than other male employees, Plaintiffs still present no evidence whatsoever that the cancellations by Mr. Mitchell or the lesser training from Mr. Vaniel occurred because of invidious gender discrimination." (App. at 20.) The Court also reasoned that "the existence of any discrimination is particularly questionable given that Mr. Papson encountered cancellations from Mr. Mitchell as well." (App. at 20.)

As to their hostile work environment claim, Ryan and McGrane argued that, when combined with Shred-It's mistreatment of them with respect to training, territory assignments, and enforcement of the sales quotas, Mitchell's conduct created a hostile work environment based upon gender. The District Court held that no reasonable trier of fact could find that Ryan and McGrane were subjected to a hostile work environment because even the combined effect of Mitchell's conduct and the other alleged

17

mistreatment did not establish severe or pervasive harassment that would alter the conditions of their employment.

Plaintiffs filed a timely notice of appeal on September 9, 2009.

**III.  Discussion[2]**

We exercise plenary review over orders granting summary judgment. *Lauren v. DeFlaminis*, 480 F.3d 259, 265-66 (3d Cir. 2007). Thus, we look to see whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Id.* at 266. In determining whether summary judgment is warranted, we review the facts in the light most favorable to the non-moving party, and draw all reasonable factual inferences in the party's favor. *Id.*

A.  *Gender Discrimination Claims*

When there is no direct evidence of discrimination, a Title VII claim of gender discrimination is analyzed according to the three-step, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). At the first step, the plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). As originally set forth in *McDonnell Douglas*, the elements of a prima facie case required a claimant to show "(i) that he belongs to a ... minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite

---

[2]The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 2000e-5(f)(3). We have jurisdiction pursuant to 28 U.S.C. § 1291.

his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802. As an alternative to the original fourth prong of the prima facie case, a plaintiff may show that similarly situated individuals outside the plaintiff's class were treated more favorably. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939-40 (3d Cir. 1997); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

We agree with the District Court that Ryan and McGrane established their prima facie case because they are female, qualified to be sales representatives, were discharged, and were replaced with male sales representatives. However, the District Court erred in holding that Grassmyer had also established a prima facie case because, unlike Ryan and McGrane, Grassmyer was not terminated and therefore does not satisfy the third requirement of the prima facie case. Moreover, with respect to Grassmyer's claim of constructive discharge, the work conditions she complains of (i.e., advertising her sales territory on the internet, negative and aggressive emails, and the termination of her co-worker McGrane) are wholly inadequate to show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). Accordingly, Grassmyer cannot succeed on her discrimination claim.

19

As for Ryan and McGrane, since they established a prima facie case of discrimination, "the burden of production shift[ed] to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* Shred-It satisfied its burden at this stage by adducing evidence that Plaintiffs were terminated due to their failure to meet the sales quotas required of all sales representatives at Shred-It.

At the third stage, to avoid summary judgment, "[t]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[3] *Id.* at 764. To discredit the employer's proffered reason, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765

---

[3]More precisely, when the question is, as it is here, one of pretext, the plaintiff must show that the unlawful discrimination was a determinative factor. *See Watson v. Southeastern Pennsylvania Transp. Authority*, 207 F.3d 207, 215 (3d Cir. 2000) ("[I]n the usual 'pretext' case, ... consideration of a protected trait must be shown to be a determinative factor in the adverse action.").

(citations and quotations omitted). We have listed the following examples of evidence from which a factfinder could reasonably conclude that an illegitimate factor was more likely than not a determinative cause of the adverse employment decision: "showing that the employer in the past had subjected [the plaintiff] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [plaintiff's] protected class more favorably, or that the employer has discriminated against other members of [the plaintiff's] protected class or other protected categories of persons." *Id.* at 765.

The Supreme Court has held that where the legitimate nondiscriminatory reason advanced by the employer pertains to the employee's subpar performance or lack of qualifications, pretext may be shown by demonstrating that the employer failed to properly train the employee. *Patterson v. McLean Credit Union*, 491 U.S. 164, 188 (1989) ("[P]etitioner could seek to persuade the jury that respondent had not offered the true reason for its promotion decision by presenting evidence of respondent's ... failure to train her for an accounting position."). We also have "recognized that when an employer discriminatorily denies training and support, the employer may not then disfavor the plaintiff because her performance is affected by the lack of opportunity." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 540 (3d Cir. 1993).

Ryan and McGrane argue that the District Court erred at the pretext stage by "overlook[ing] reasonable inferences of discrimination arising from largely unexplained differences in treatment, and fail[ing] to consider the evidence in its entirety."

(Appellants' Op. Br. at 21-22.) We agree. While it is undisputed that Plaintiffs were not meeting their sales quotas, they have produced evidence, which, when viewed in the light most favorable to them, would permit a rational jury to conclude that Shred-It discriminated against them in ways that affected their ability to meet the sales quotas and that Shred-It applied the sales quotas unevenly among male and female sales representatives.

As to training and territories, the evidence, when viewed in Ryan's and McGrane's favor, raises material issues of fact as to whether gender discrimination was the determinative factor in Shred-It's actions. The evidence indicates that, despite their requests for training and assistance, Ryan and McGrane were denied the same opportunities as the male sales representatives with respect to ride-alongs and shadowing opportunities. The evidence also can be viewed as indicating that certain territories offered greater sales opportunities than others, and that Ryan and McGrane were not notified of territory openings or given the same opportunities as men to move into desirable geographic areas.

Moreover, Ryan and McGrane have demonstrated "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Shred-It's proffered reasons for their sales territory allocations. Laspina's assertion that he alone decided to give Milavec a portion of McGrane's territory and that he did it because it "had a tremendous amount of opportunity" (App. at 517), is in direct conflict with Vaniel's assertion that the decision

22

was made only for logistical reasons and that he and Laspina made the decision jointly. Laspina's explanation also seems to suggest that some territories did, in fact, have more opportunities than others, which contradicts his other assertion that a sales representative's ability to meet the sales quotas is not impacted by his or her sales territory because "every territory is a good territory, [and] [i]t is what the sales representative makes of that territory." (App. at 517.) Moreover, while Laspina claims to have notified all sales representatives of territory openings at sales meetings, Stephens did not recall Laspina ever notifying the other sales representatives about the territory he was given in the fall of 2003, and the secrecy with which McGrane's territory was taken from her and given to Milavec suggests that Shred-It assigned Plaintiffs to certain territories without consulting them or notifying them of potential opportunities.

Finally, there is evidence showing that the sales quotas were enforced more harshly against Ryan and McGrane than they were against male sales representatives Bowser, Pavlecic, and Papson. The District Court was unpersuaded by this evidence, mostly because of the fact that over the course of the last five years, Shred-It has terminated seven male sales representatives for failing to meet the sales quotas, as compared with only four female sales representatives. However, Shred-It's past employment statistics say nothing about the training and territory allocations of the male and female sales representatives who were terminated over the last five years or whether Shred-It otherwise discriminated against women in ways that affected their ability to meet

23

the sales quotas, as is alleged here. Furthermore, even if Shred-It's employment statistics conclusively showed that it had not discriminated against women in the past, that would not immunize it from all present and future claims of gender discrimination. Ryan and McGrane have presented more recent evidence indicating unequal treatment, and we must view the evidence in the light most favorable to them at the summary judgment stage.

In sum, Ryan and McGrane have presented sufficient evidence to survive summary judgment, evidence that raises material factual issues about whether Shred-It treated similarly situated male sales representatives more favorably than female sales representatives when it came to enforcement of the sales quotas, training, and sales territory allocations. That same evidence also raises material factual issues about whether gender discrimination was a determinative factor in any such disparate treatment. In addition, Ryan and McGrane have demonstrated substantial inconsistencies in some of Shred-It's proffered reasons for its treatment of the Plaintiffs. Accordingly, the District Court erred in granting summary judgment in favor of Shred-It on Ryan's and McGrane's gender discrimination claims.

B.  *Hostile Work Environment Claims*

Title VII of the Civil Rights Act makes it unlawful for an employer to condone a sexually hostile work environment. 42 U.S.C. § 2000e-2(a)(1); *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). "Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or

24

creates an intimidating, hostile, or offensive working environment." *Weston v. Pennsylvania*, 251 F.3d 420, 425-26 (3d Cir. 2000). To be actionable, "the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Id.* at 426. We have developed a five step test with respect to hostile work environment claims that requires McGrane and Ryan to show: "(1) [they] suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [them]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990).

Plaintiffs conceded in the District Court that, standing alone, Mitchell's comments are not sufficient to show a hostile work environment. We agree. While sophomoric and no doubt offensive, Mitchell's language was not, by Ryan's and McGrane's own admission and by the evidence produced, so "severe or pervasive" as to support a hostile work environment claim. *Penn. State Police v. Suders*, 542 U.S. 129, 133 (2004). Even when combined with their other complaints, there is an insufficient showing of harassment to be actionable. While Ryan and McGrane may have been neglected and treated unequally, the treatment they received did not rise to the level of being abusive and altering the conditions of the sales work at Shred-It. *See Weston*, 251 F.3d at 426 ("In order to be actionable, the harassment must be so severe or pervasive that it alters the

conditions of the victim's employment and creates an abusive environment."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) ("To bring an actionable claim for sexual harassment because of an intimidating and offensive work environment, a plaintiff must establish by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee").

## IV.    Conclusion

For the foregoing reasons, we will affirm the District Court's order with respect to Ryan's and McGrane's hostile work environment claim and Grassmyer's gender discrimination claim, but will vacate with respect to Ryan's and McGrane's claim for gender discrimination under Title VII.  The case is remanded for further proceedings consistent with this opinion.