PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2075
_____

RANDY MARTIN MULHOLLAND; CHRISTINE KURTZ,
                                                    Appellants
v.

THE GOVERNMENT COUNTY OF BERKS,
PENNSYLVANIA; BERKS COUNTY CHILDREN AND
YOUTH SERVICES; GEORGE KOVARIE, MSW, LSW
EXECUTIVE DIRECTOR OF BERKS COUNTY
CHILDREN & YOUTH SERVICES,
IN HIS OFFICIAL CAPACITY


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cv-05616)
District Judge:  Hon. Berle M. Schiller

_____


Argued
November 13, 2012

Before:   SCIRICA, FISHER, and JORDAN, *Circuit Judges*.
(Filed: January 28, 2013)

_____

Thomas G. Wolpert   [ARGUED]
Wolpert Schreiber
527 Main Street
Royersford, PA   19468
    *Counsel for Appellants*

Matthew J. Connell   [ARGUED]
Lamb McErlane
24 E. Market Street
P.O. Box 565
West Chester, PA   19381
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Appellants Randy Mulholland and Christine Kurtz appeal a decision of the United States District Court for the Eastern District of Pennsylvania rendered during trial, granting judgment as a matter of law against them on the claims they brought under 42 U.S.C. § 1983 against Berks County, Pennsylvania.[1]  For the following reasons, we will affirm.

_____

[1] Appellants originally brought their suit against not only Berks County, but also Berks County Children and Youth Services and its executive director, George Kovarie, in his official capacity.  The District Court granted summary

## I.   Background[2]

### A.    *The July 1996 Incident*

In July 1996, Mulholland and Kurtz, who consider themselves married under the common law, were separated.[3] They agreed that on the night of July 6, 1996, their twelve-year-old daughter, Linda Kurtz, who was visiting from Texas where she lived with Kurtz's mother, would stay at Mulholland's apartment. Linda called Kurtz that evening and said that Mulholland was drunk and was making her feel uncomfortable. Kurtz promptly called the police and went to pick up Linda. When the police arrived at Mulholland's apartment, they interviewed Linda. A police report from that night contains a statement from Linda that Mulholland

---

judgment as to the claims against the agency and Kovarie, but it denied summary judgment for Berks County. Appellants do not appeal the District Court's grant of summary judgment, *see infra* note 12, and this opinion accordingly addresses only the subsequent trial involving the remaining claims against the County.

[2] In accordance with our standard of review, *see infra* note 13, we set forth the facts in the light most favorable to Appellants. *See Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987) (holding that judgment as a matter of law is proper "only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law").

[3] At the time, Kurtz lived with Mulholland's brother, Robert Mulholland.

masturbated in her presence and made sexual comments to her, including that he was "horny," wanted her to "rub [his] private parts," and "want[ed] to hump [her] butt." (App. at 663.) The report also indicates that the police notified "children services," *i.e.*, the Berks County Office of Children and Youth Services ("BCCYS"), of the incident. (App. at 664.)

Separate from the police investigation and subsequent investigation by BCCYS, Kurtz filed a petition for protection from abuse against Mulholland in the Berks County Court of Common Pleas on July 8, 1996, accusing him of seeking sex from Linda.[4] A protection from abuse order was entered after Mulholland failed to appear at two hearings.

BCCYS received the report of suspected child abuse from the police and assigned caseworker Brandy Neider to investigate. On August 2, Neider completed a document known as a CY-48 form, classifying Mulholland as an "indicated" perpetrator of child abuse, and she sent it to Pennsylvania's statewide child abuse registry. That registry, known as ChildLine, is operated and maintained by the Pennsylvania Department of Public Welfare ("DPW").[5]

---

[4] In 2009, Kurtz testified in the present action that she had made up the charge that Mulholland had made sexually inappropriate remarks to Linda, and that she did so to ensure that "he couldn't get visits anymore." (App. at 165.)

[5] A county agency, like BCCYS, may render three conclusions by sending a CY-48 form to DPW: namely, that the allegations of child abuse are "founded," "indicated," or "unfounded." A "founded" report is appropriate "if there has been any judicial adjudication based on a finding that a child

4

Neider stated in her report that Linda "made consistent and believable statements to [a] caseworker and [a] collateral source," and confirmed the statements she had made to the police regarding Mulholland's inappropriate behavior. (App. at 674.) The report also indicated that when Kurtz arrived at the apartment to retrieve Linda, she saw Mulholland "in bikini underwear with an erection." (App. at 674.) Neider noted that Mulholland "did not respond to [a] request for [an] interview."[6] (App. at 673-74.) Based on the CY-48 form, Mulholland was listed on ChildLine as an "indicated" perpetrator of child abuse.

---

who is a subject of the report has been abused, including the entry of a plea of guilty or nolo contendere or a finding of guilt to a criminal charge involving the same factual circumstances involved in the allegation of child abuse." 23 Pa. Cons. Stat. Ann. § 6303. An "indicated" report is appropriate "if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following: (1) Available medical evidence. (2) The child protective service investigation. (3) An admission of the acts of abuse by the perpetrator." *Id.* "[S]ubstantial evidence" is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." *Id.* An "unfounded" report is one that is not "founded" or "indicated." *Id.*

[6] As discussed below, Neider has no recollection of the 1996 investigation, and she based her testimony in 2009 solely on the CY-48 form. In contrast, witnesses from the Mulholland–Kurtz family, including Linda, testified in 2009 that no one from BCCYS ever interviewed Linda.

5

Mulholland was arrested and charged on July 6, 1996, with indecent exposure and endangering the welfare of a child. The complaint was later amended to include a harassment charge. Mulholland pled guilty on September 24, 1996, to the harassment charge, for which he paid a $50 fine, and the remaining charges were dismissed.[7]

## B.     *Subsequent Contacts with BCCYS*

In the years following the July 1996 incident, the Mulholland–Kurtz family had further encounters with BCCYS. In 1998, Linda ran away from her grandmother's home in Texas, where she was still living at the time. When she arrived at the bus terminal in Reading, Pennsylvania, she called Mulholland and asked him to pick her up. Mulholland retrieved her from the bus station, called BCCYS, and agreed to put her in a shelter until she could be returned to Texas. A BCCYS caseworker told Linda that she could not see her father because "he did something with [her]." (App. at 116-17.) According to her 2009 trial testimony in this action, Linda denied the allegation at the time, but the caseworker "said she did not care and [did not] want to hear it." (App. at 117.)

In 1999, Mulholland's and Kurtz's then-teenage son Irvin was adjudicated delinquent for raping his younger cousin. In connection with that incident, BCCYS proposed a family service plan in which it identified Mulholland as a "perpetrator." Mulholland and Kurtz, who had resumed

---

[7] Appellants insisted at the trial in this case in 2009 that Mulholland pled guilty to harassing Christine Kurtz, not Linda Kurtz.

living together, refused the agency's services.  In response to the family service plan, a lawyer representing Mulholland and Kurtz sent a letter to BCCYS, stating:

> [Y]our documentation refers to Mr. Mulholland as being a "perpetrator." …  It appears that you are insinuating that there has been sexual abuse committed by Mr. Mulholland.  This allegation and reference is unfounded and you should immediately cease and desist from any such reference and delete any such reference from you[r] records.

(App. at 561.)  Several days later, the lawyer sent a second letter to BCCYS threatening that, if any BCCYS record containing allegations of sexual abuse was not immediately expunged, Mulholland would take legal action.  BCCYS never responded to either letter, and Mulholland took no further action.

On August 27, 2003, a BCCYS caseworker visited Appellants' home to inquire about a child of Brenda Heddy's.  Heddy is Kurtz's sister-in-law and had, along with her six children, moved in with Mulholland and Kurtz.  The caseworker concluded that the children were safe since all adults in the home (Heddy, Kurtz, and Mulholland) understood that Barry Kurtz, Sr., the children's father, was not allowed to be alone with any of the children because he was listed as an indicated perpetrator of child abuse on ChildLine.  The caseworker gave no indication that Mulholland himself was similarly listed on ChildLine.  A BCCYS caseworker visited the home again in October 2005 and again concluded that all children in the home were safe.

7

Mulholland contacted BCCYS in September 2006, after Kurtz took their granddaughter S.G. away from the home of the child's parents, Irvin and his girlfriend, who, in Kurtz's view, were neglecting S.G. A BCCYS caseworker visited Mulholland's and Kurtz's home on September 23, 2006, and determined that S.G. could stay there over the weekend. No indication was given that Mulholland might pose a threat to the children's safety.

On September 29, 2006, Mulholland and Kurtz appeared before a judge of the Berks County Court of Common Pleas. In the presence of multiple BCCYS employees, the judge issued an order granting temporary custody of S.G. to Kurtz. When Mulholland and Kurtz returned home with S.G. that evening, however, they encountered a group of BCCYS caseworkers and police officers. Following the custody proceeding, BCCYS had obtained an emergency court order to remove Mulholland's and Kurtz's two teenage children, Heddy's children, and S.G. from the home, based on Mulholland's listing on ChildLine as an indicated perpetrator of child abuse. Mulholland's and Kurtz's children were returned to Kurtz approximately six weeks later, after Kurtz moved into a separate residence. The Heddy children were not returned to the care of Heddy and Kurtz until June 2008.[8]

---

[8] The record does not indicate whether S.G. was ever returned to Kurtz's custody. Appellants note in their opening brief only that "S.G. has since been adopted and has no further involvement with Appellants or Appellee." (Appellants' Opening Br. at 15 n.6.)

Mulholland and Kurtz later testified that they were not told of Mulholland's listing on ChildLine until March 2007 and that prior to that time they were unaware of the listing. That claim is puzzling not only because Mulholland, through counsel, had responded in 1999 to a BCCYS statement that he was a child abuse "perpetrator," but also because the confrontation with BCCYS caseworkers and the police in September 2006 should surely have given Mulholland and Kurtz some idea of Mulholland's ChildLine listing. Nevertheless, they say that, upon first becoming aware of the ChildLine listing in March 2007, they took steps to remove him from the registry. The criminal charges of indecent exposure and endangering the welfare of a child, which had been dismissed in 1996 but remained on Mulholland's criminal record, were expunged on May 4, 2007, via a court order. By the time Mulholland attempted to appeal his ChildLine listing in late 2007, BCCYS had destroyed its records of the 1996 investigation pursuant to a provision of the Pennsylvania Child Protective Services Law ("CPSL") that requires county agencies to destroy all records about a child when he or she reaches the age of twenty-three.[9]

---

[9] The CPSL provides that "all information which identifies the subjects of founded and indicated child abuse reports shall be expunged when the subject child reaches the age of 23." 23 Pa. Cons. Stat. Ann. § 6338(b). DPW is to establish a "subfile" in ChildLine, however, "to indefinitely retain the names of perpetrators of child abuse … if the individual's Social Security number or date of birth is known to the department." 23 Pa. Cons. Stat. Ann. § 6338(c). It is unclear from the record why Neider's 1996 CY-48 form survived the mandated destruction.

Mulholland did not appeal his ChildLine listing until shortly after Linda had turned twenty-three.

In 2008, DPW's Bureau of Hearings and Appeals[10] found that DPW had not sent notice to Mulholland in 1996 at the time he was listed on ChildLine, and it ordered a hearing on the merits. At the merits hearing, BCCYS argued that Mulholland's status should be changed from "indicated" perpetrator to "founded" perpetrator because he had pled guilty to the harassment charge arising from the July 1996 incident.[11] By order dated March 2, 2009, however, the

---

[10] Under the CPSL, the secretary of DPW may, at any time, "amend or expunge any record [made pursuant to the CPSL] upon good cause shown." 23 Pa. Cons. Stat. Ann. § 6341(a)(1). "[W]ithin 45 days of being notified of the status of the report," a "person named as a perpetrator … in an indicated report of child abuse may … request the secretary [of DPW] to amend or expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with [the CPSL]." *Id.* § 6341(a)(2). If the secretary grants the request, the relevant "county agency and any subject have 45 days in which to file an administrative appeal with the secretary." *Id.* § 6341(b). If the secretary denies the request, the individual has a right to a hearing before DPW's Bureau of Hearings and Appeals. *Id.* § 6341(c); 55 Pa. Code § 3490.106a. The decision of the Bureau of Hearings and Appeals may be appealed to a state court. 2 Pa. Cons. Stat. Ann. § 702; 55 Pa. Code § 3490.106a(e).

[11] As previously noted, *supra* note 5, the CPSL provides that allegations of child sexual abuse are "founded" where there is a "finding of guilt to a criminal charge

---

10

Bureau of Hearings and Appeals adopted the recommendation of an administrative law judge who found that no substantial evidence existed to maintain Mulholland's listing on ChildLine as even an indicated perpetrator of child abuse. The decision was affirmed upon reconsideration by DPW and on appeal to the Commonwealth Court of Pennsylvania. The ChildLine listing was expunged as of July 23, 2010.

C.    *Trial and Procedural History*

On October 25, 2010, Mulholland and Kurtz brought suit in the United States District Court for the Eastern District of Pennsylvania against Berks County, BCCYS, and BCCYS Executive Director George Kovarie in his official capacity. The District Court granted the defendants' motion for summary judgment as to the claims against BCCYS and Kovarie.[12] Mulholland's and Kurtz's remaining claims against Berks County proceeded to trial. They claimed that the County was liable for BCCYS violations of their procedural and substantive due process rights. More specifically, the claims at trial were that the County was liable for (1) failing to conduct an adequate investigation before

---

involving the same factual circumstances involved in the allegation of child abuse." 23 Pa. Cons. Stat. Ann. § 6303.

[12] With respect to BCCYS, the Court reasoned that, for purposes of § 1983 liability, a county agency is not a legally separate entity from the county itself, and any actions by the agency are imputed to the county. As for Kovarie, the Court concluded that a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them.

11

reporting Mulholland to ChildLine as an indicated perpetrator of child abuse; (2) failing to notify Mulholland of BCCYS's recommendation to list him as an indicated perpetrator of child abuse on ChildLine; (3) failing to update ChildLine with exculpatory information, namely, that (a) the child sex abuse charges against Mulholland were eventually dropped and he pled guilty only to harassing Christine Kurtz, (b) Linda recanted her allegations against Mulholland to a BCCYS caseworker in 1998, and (c) Mulholland denied through his attorney in 1999 that he was a "perpetrator"; (4) removing Mulholland's and Kurtz's children and grandchild and the Heddy children from their home in 2006; and (5) attempting to change Mulholland's status from "indicated" to "founded" during the appeals process.

At trial, Appellants presented the testimony of various family members, including Mulholland, Kurtz, and Linda. All three testified that nothing warranting a child services investigation occurred that consequential evening of July 6, 1996 – that Mulholland never made any statements or took any actions of a sexual nature. Linda even claimed that she could not "recall saying anything to anyone that indicated [that her] father did anything or said anything sexual." (App. at 113.)

They also testified that neither BCCYS nor the police ever contacted them to investigate the incident. Linda testified, for example, that she never spoke with the police or any caseworker from BCCYS, including Neider. Mulholland and Kurtz further testified that they did not recall ever receiving notice from BCCYS or DPW regarding Mulholland's placement on ChildLine. In fact, they reaffirmed, they had no clue that Mulholland had been listed

12

on ChildLine until March 2007 when BCCYS finally provided the reason for taking the children from their home.

In her testimony, Kurtz sought to downplay evidence that she herself had accused Mulholland of inappropriate behavior toward Linda in July 1996. She insisted that she filed a petition for protection from abuse against Mulholland only because he broke his word by getting drunk in front of Linda and her brother, and because she interpreted Linda's statement that Mulholland had made her "uncomfortable" to mean that he "was making remarks … about" Kurtz. (App. at 165.) That made her "mad," she testified, so she "put down that [Mulholland] was talking dirty to [Linda]," even though it was not true, so "he couldn't get visits anymore." (App. at 165.) In addition, Mulholland testified that he understood that he had pled guilty to harassing Kurtz in September 1996, not Linda.

Appellants also called two BCCYS employees, George Kovarie and Brandy Neider, to testify. Each testified regarding BCCYS's policies and customs, and Neider testified about her involvement in the 1996 investigation by BCCYS. Neider, who at the time of trial was the director of BCCYS's intake services department, had been a caseworker in 1996 in the sexual abuse unit. Although she had no independent recollection of her investigation in Linda's case, Neider relied on the existing documentation of the investigation to testify that she had indeed interviewed Linda. In particular, in the CY-48 form, Neider said that Linda "made consistent and believable statements" that Mulholland had engaged in the alleged inappropriate behavior. (App. at 674.) The form also stated that Mulholland "did not respond to [a] request for [an] interview." (*Id.*) Neider testified that

13

the existing documentation was consistent with her usual investigation practices, and she indicated that, under identical circumstances today, she would still conclude that the report of sexual abuse against Mulholland was "indicated."

Regarding BCCYS's policies and customs, both Kovarie and Neider said that the mission of BCCYS is to protect children and to preserve family integrity as provided by the CPSL. Each caseworker reports to a supervisor, who in turn reports to a departmental director. Newly hired BCCYS caseworkers go through 120 hours of training on all of the agency's functions, before they are certified for direct service with families. They also receive a minimum of twenty hours of training each year. Neider, as the director of intake services, develops and applies policies and procedures in that area. She testified that BCCYS, as a matter of policy, follows the child abuse investigation and reporting requirements of the CPSL and accompanying regulations.

Neider also testified that, although the CPSL does not require it, BCCYS has an internal policy of sending a letter to alleged perpetrators at the conclusion of an investigation, at the same time it submits the CY-48 form to ChildLine, to provide notice of the agency's status determination. BCCYS caseworkers receive training in sending out such notices. Neider testified that she could not recall any other situation in which an individual had complained about not receiving a notice from BCCYS.

With respect to BCCYS's statutory duty to provide supplemental information to ChildLine even after an

indicated report has been submitted,[13] Neider testified that BCCYS has a policy of submitting so-called CY-49 forms to report birth dates, Social Security numbers, or additional evidence of abuse, but not to report exculpatory information. Accordingly, as Neider described the policy, BCCYS does not submit a CY-49 form when an alleged victim of abuse later recants or when an alleged perpetrator denies culpability. Instead, BCCYS leaves it to the appeals process provided by the CPSL to determine whether a report status should be changed to "unfounded."

Kovarie, the director of BCCYS, testified that individual caseworkers lack the authority to unilaterally remove children from a home. Rather, BCCYS must first petition a court for an order requiring the removal of the children, and, before it files such a petition, BCCYS complies with an internal policy that at least three BCCYS supervisors must review and sign off on the petition. Kovarie testified that this process was followed when BCCYS decided to petition the juvenile court for the removal of children from Appellants' home.

After Appellants rested their case-in-chief, Berks County moved for judgment as a matter of law under Rule

---

[13] For founded and indicated reports, Pennsylvania law requires that the county agency shall submit a "supplemental child abuse report form," known as a CY-49 form, "when additional case information is obtained, including dates of birth, identity of the subjects, additional information about the nature of the abuse, or the case is presented before a court and there is a change in the status of the report." 55 Pa. Code § 3490.67(d).

15

50(a) of the Federal Rules of Civil Procedure. As discussed in greater detail below, the Court granted that motion, and this timely appeal followed.

## II.    Discussion[14]

Mulholland and Kurtz reassert on appeal their claim

---

[14] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. Rule 50(a)(1) of the Federal Rules of Civil Procedure provides:

> If a party has  been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). Our review of a district court's grant of judgment as a matter of law is plenary. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). A motion for judgment as a matter of law under rule 50(a) will be granted "only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987).

16

under 42 U.S.C. § 1983 that Berks County is liable for violating their procedural and substantive due process rights. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law … .

42 U.S.C. § 1983.

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658 (1978)). In other words, the County may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*, *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990), but "it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Beck*, 89 F.3d at 971.

Based on the Supreme Court's reasoning in the landmark *Monell* case, courts have recognized a "two-path track to municipal liability under § 1983, depending on

whether the allegation is based on municipal policy or custom." *Beck*, 89 F.3d at 971.

> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Andrews*, 895 F.2d at 1480 (citations omitted) (alterations in original). "Custom … may also be established by evidence of knowledge and acquiescence." *Beck*, 89 F.3d at 971.

An official has policymaking authority for *Monell* purposes when the official is responsible as a matter of state law for making policy in the particular area of county business in question, and the official's authority to make policy in that area is final and unreviewable. *Hill v. Borough of Kutztown*, 455 F.3d 225, 245-46 (3d Cir. 2006).

Thus, to establish municipal liability under § 1983, Appellants must show that they were deprived of "rights, privileges, or immunities secured by the Constitution and laws,"[15] and that the deprivation of those rights was the result

---

[15] It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim. *See, e.g.*, *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a municipal employee "inflicted no constitutional injury … , it

of an official government policy or custom. Using that framework, we analyze each of Appellants' constitutional claims.

A. *Procedural Due Process Claims*

Mulholland and Kurtz contend that the District Court erroneously granted judgment against them on their procedural due process claims against Berks County. "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill*, 455 F.3d at 233-34. To determine what process is due in a particular situation, courts consider three factors: first, the private interest at stake; second, the risk of erroneous deprivation of that interest through the procedures used and the probable value of different procedures; and third, the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (internal quotation marks omitted). To sustain a claim under § 1983 based on a violation of procedural due process, Mulholland and Kurtz "must, at a minimum, prove recklessness or 'gross negligence' and in some instance may

_____

is inconceivable that [the municipality] could be liable"); *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003) ("[T]he initial question in a section 1983 action is whether the plaintiff has alleged a deprivation of a constitutional right at all." (internal quotation marks omitted)).

be required to show a 'deliberate decision to deprive' the plaintiff of due process." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir. 1994).

### 1.    *Inadequate Investigation*

Appellants point out that, on one hand, multiple members of the Mulholland–Kurtz family "testified consistently that there was no investigation" (Appellants' Opening Br. at 40 (emphasis omitted)), that in fact "no one involved was ever contacted or interviewed directly by BCCYS and/or Neider" regarding the 1996 incident (*id.* at 40-41). On the other hand, Neider, "[w]ith no independent recollection of her investigation, and relying solely on the CY48 form," claimed at trial that she spoke to Linda at the time of the July 1996 incident. (*Id.* at 40.) Based on that conflicting testimony, Appellants argue, "[i]t was up to the jury to decide whether BCCYS'[s] investigation was constitutionally adequate." (*Id.* at 41.)

The District Court declined to decide whether BCCYS's investigation was inadequate such that it violated Mulholland's procedural due process rights. Instead, the Court found that "[t]here is no evidence that BCCYS has a policy or custom of conducting inadequate investigations into allegations of child abuse." (Dist. Ct. Op. at 18.) To the contrary, the only evidence presented in Mulholland's and Kurtz's case-in-chief was that "BCCYS has a policy of complying with the procedures set forth by the CPSL."[16]

---

[16] Those procedures include: interviewing, if possible, "those persons who are known to have or may reasonably be expected to have, information relating to the incident of

(*Id.*) Thus, the Court determined that even if BCCYS's investigation was inadequate, it cannot be said to have been influenced by some "policy or custom of BCCYS." (*Id.*)

The District Court was correct. Without more, Berks County, the municipality of which BCCYS is simply an agency, cannot be held liable under § 1983 for a single caseworker's alleged deviation from the requirements of the CPSL. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) ("Supervisory liability cannot be based solely upon the doctrine of respondeat superior … ."). There is no evidence that BCCYS employs a policy or has a custom of conducting desultory investigations, and the District Court correctly declined to subject Berks County to municipal liability for that claim.

### 2. *Failure to Provide Notice at the Conclusion of the Investigation*

The District Court ruled as a matter of law against Appellants' claim that the County, through BCCYS, violated their constitutional rights by failing to notify Mulholland of his listing on ChildLine, because the "CPSL allocates the responsibility for providing notice of a ChildLine listing to

suspected child abuse," including "[t]he child, if appropriate," "[t]he child's parents," and "[t]he alleged perpetrator of the suspected child abuse," 55 Pa. Code § 3490.55(d); and notifying "the subject" of a report of child abuse "who is about to be interviewed of the existence of the report, the subject's rights," and his "rights pursuant to [the CPSL] in regard to amendment or expungement," 23 Pa. Cons. Stat. Ann. § 6368(a).

the Department of Public Welfare, not the county agency." (D. Ct. Op. at 15 (citing 55 Pa. Code §§ 3490.40, 3490.40a).) In so holding, the Court acknowledged that DPW's "Bureau of Hearings and Appeals found that Mulholland did not receive proper notice from [DPW], which is not a party in this case," but the Court held that the County "cannot be held liable for [DPW's] failure to send proper notice." (D. Ct. Op. at 15.) The Court noted that BCCYS's policy of notifying alleged child abuse perpetrators of the results of an investigation "goes beyond what the CPSL requires." (D. Ct. Op. at 18.) And "[t]here is no evidence that BCCYS has a widespread practice of failing to provide notice in accordance with its internal policy." (D. Ct. Op. at 18-19.) The only testimony about the notification practice at BCCYS was provided by Neider, who "testified that she could not recall another situation in which an individual claimed not to have received notice from BCCYS." (D. Ct. Op. at 19.)

We agree. Not only does the statutory duty to inform an individual that he is to be listed on ChildLine fall upon DPW and not BCCYS, *see* 55 Pa. Code § 3490.40 (providing that ChildLine shall provide notice to an individual that an "indicated report[] of child abuse [has been] entered into the Statewide Central Register"), but, even if BCCYS were responsible for notifying alleged predators, a one-time failure to do so would not subject the County to municipal liability under § 1983 because it does not show that the failure resulted from an agency policy or custom. The only evidence regarding the BCCYS practice in that regard shows instead that the agency consistently complied with its internal policy of notifying the subject of a report of child abuse of the result of its investigation. The District Court thus correctly ruled against Appellants on that claim.

### 3. *Failure to Update ChildLine with Exculpatory Information*

Mulholland and Kurtz argue that the County violated their procedural due process rights by failing to update ChildLine when BCCYS became aware of information that cast doubt on the child abuse allegations against Mulholland. The evidence adduced at trial demonstrated that this claim was based on an actual BCCYS policy, as opposed to the allegedly unconstitutional actions of an isolated employee. Neider testified that BCCYS has a policy of submitting CY-49 forms to ChildLine to report birth dates, Social Security numbers, or additional evidence of abuse, but not to report exculpatory information, including denials and recantations. Accordingly, BCCYS does not submit a CY-49 form when an alleged victim of abuse later recants or when an alleged perpetrator denies culpability after BCCYS's investigation has concluded. Instead, BCCYS leaves it to DPW's appeals process to determine whether a report status should be changed.

Despite BCCYS's policy, the District Court rejected Appellants' *Monell* claim because Appellants did not offer "any support for their view that the Due Process Clause requires a county agency to report exculpatory information after it has completed its investigation and submitted a report to ChildLine." (D. Ct. Op. at 16.) The District Court went on to say that, "[g]iven that the CPSL provides for notice and a meaningful opportunity to be heard through the appeals process, [there is] no basis for imposing on county agencies an additional constitutional burden to update upon receiving exculpatory information." (D. Ct. Op. at 16.)

23

That is entirely correct. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted). The essence of Appellants' claim regarding exculpatory information is that BCCYS's policy denied them their opportunity to have that new information made of record. But the process provided by the CPSL allows a subject of a report of child abuse the opportunity to air new information at a meaningful time and in a meaningful manner,[17] and due process does not require more.[18] That holds true even if we give full credit to Mulholland's claim that he did not receive notice of his

---

[17] *See* 23 Pa. Cons. Stat. Ann. § 6341(a) (providing that, "[a]t any time," (1) the secretary of DPW "may amend or expunge any record under this chapter upon good cause shown and notice to the appropriate subjects of the report," and (2) "[a]ny person named as a perpetrator … in an indicated report of child abuse may, within 45 days of being notified of the status of the report, request the secretary [of DPW] to amend or expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with this chapter").

[18] We note, in addition, that denials and recantations are notoriously unreliable, *see United States v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) (noting, in context of motion for new criminal trial, that "the skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon"), and the CPSL's appeals process provides an appropriate mechanism for measuring the reliability of such evidence in a full and fair way.

ChildLine listing. As we have explained, *see supra* Part II.A.2, the blame for failing to notify Mulholland lies with DPW, not with Berks County. The County cannot be faulted for relying on the statutory notice and appeals process when the alleged breakdown in that process occurred at the hands of a state agency.[19]

---

[19] *Mathews* provides further support for the conclusion that BCCYS's policy did not result in a violation of Appellants' procedural due process rights. Neider testified that in the course of her career – over 750 investigations and counting – she could not recall a single instance, other than this case, of a person listed on ChildLine complaining of a lack of notice. Given that each notice was required by statute to inform the subject of his right to appeal his listing, *see* 23 Pa. Cons. Stat. Ann. § 6338(a) (providing that notice "shall also inform the recipient of his right, within 45 days after being notified of the status of the report, to appeal an indicated report, and his right to a hearing if the request is denied"); *see also* 55 Pa. Code § 3490.40 (notice shall inform subject of "right to request the Secretary [of DPW] to amend or expunge the report"), BCCYS's policy did not create a risk of erroneous deprivation of a subject's familial due process rights. *See Mathews*, 424 U.S. at 335 (noting that "due process generally requires consideration of," among other things, "the risk of an erroneous deprivation of [due process] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"). Because notice is indeed provided in the overwhelming majority of cases, BCCYS reasonably left it to the appeals process to work out denials and recantations.

B.      *Substantive Due Process Claims*

In addition to their procedural due process claims, Mulholland and Kurtz raised two substantive due process claims, both of which the District Court rejected.  To establish a substantive due process violation by a municipality, a plaintiff must show that executive action was "so ill-conceived or malicious that it shocks the conscience." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (internal quotation marks omitted).  Specifically, a child welfare agency abridges an individual's substantive due process rights when its actions "exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Id.* at 375-76; *see also B.S. v. Somerset Cnty. Children and Youth Servs.*, __ F.3d __, __ (3d Cir. 2013) ("[A] substantive due process claim requires decision-making by a social worker that is so clearly arbitrary … [that it] can properly be said to 'shock the conscience.'" (internal quotation marks omitted) (alterations in original)).

That standard is met if the child is removed without "an objectively reasonable suspicion of abuse," based on the information available at the time.  *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997).  "Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power." *Id.* That is because "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.*  Reasonable suspicion is lacking when a child welfare agency has "consciously disregarded a great risk that there

26

had been no abuse." *Ziccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir. 2002).[20]

[20] Mulholland and Kurtz framed one of their procedural due process claims – that BCCYS failed to update ChildLine with exculpatory information – as a substantive due process claim as well. Appellants alleged that BCCYS's policy of not supplementing ChildLine with exculpatory information represented a conscious disregard of a known risk – *i.e.*, that parental rights would be violated as a result of an individual's unjust placement on ChildLine.

The District Court granted judgment against that claim, holding that BCCYS's policy "was not 'so clearly arbitrary' as to shock the conscience" (D. Ct. Op. at 16 (quoting *Miller*, 174 F.3d at 376)), both because Mulholland and Kurtz "did not establish that BCCYS was actually aware that two of the charges against Mulholland had been dismissed or that Linda was not the victim of the harassment charge to which Mulholland pled guilty," and because "Mulholland's denial of culpability and Linda's recantation approximately two years after the July 1996 incident were not sufficient to undermine an objectively reasonable suspicion of abuse." (D. Ct. Op. at 16-17.)

We affirm that holding of the District Court for two reasons. First, recantations in the child abuse context are, as already noted, *supra* note 18, rightly viewed with skepticism. Second, the policy does not represent a conscious disregard of a known risk, given that DPW is required by law to notify individuals of their placement on ChildLine and of their right to appeal. There is no evidence of any other case in which DPW failed to provide notice, and the CPSL's appeals process provides an avenue for the sort of denials and

1. *Removal of Mulholland's and Kurtz's Children and Grandchild*

Appellants contend that the removal of their children and grandchild from their home in 2006 violated their substantive due process rights.[21] The District Court denied that claim as a matter of law because, although "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," *McGreevy v. Stroup*, 413 F.3d 359, 368 (3d Cir. 2005) (internal quotation marks omitted), "Plaintiffs offered no proof at trial that an individual with policymaking authority actually reviewed the petition that led to the September 29, 2006 court order." (D. Ct. Op. at 20.) The Court held, therefore, that Appellants "have not established that BCCYS's role in the removal of their children and grandchild[] from their home was pursuant to an official policy or custom" (*id.*), and it declined to address whether Appellants' underlying constitutional claim had merit.

---

recantations Appellants raise. 23 Pa. Cons. Stat. Ann. § 6341. BCCYS was thus not deliberately indifferent to a known risk. Rather, the agency reasonably relied on the CPSL-mandated notice and the appeals process to identify meritorious denials and recantations.

[21] They also insist that the County deprived them of their due process rights when it removed the Heddy children from the home. That right, they argue, existed because Kurtz provided substantial care to the Heddy children. But we have never held that an aunt possesses a substantive due process interest in rearing her nieces and nephews when the children's biological mother is already carrying out that responsibility, and we decline to recognize any such interest in this case.

Mulholland and Kurtz argue that that holding is "nonsensical." (Appellants' Opening Br. at 36.) They point to the testimony of George Kovarie, who testified that petitions to remove children from a home are made by a three-person petition review committee, and they assert that the committee in this case must have comprised "final decision makers." (*Id.* at 27.) The committee's actions, they say, thus represented "an official act of the agency." (*Id.* at 27-28.)

As to the merits of their due process claim, Appellants contend that "[t]here was no reason or articulable evidence" at the time the children were removed from the home that the children "were being abused." (*Id.* at 36.) In fact, they contend, "BCCYS's own investigations in 2003, 2005 and 2006 demonstrated" that there was no risk of harm to the children, and the removal of the children from the family home in September of 2006 was therefore made without an "objectively reasonable suspicion of abuse." (*Id.* at 36-37.) In their view, BCCYS's decision to remove the children from the home was thus "an arbitrary abuse of power that shocks the conscience" (*id.* at 37), and was made without any reasonable suspicion that child abuse was occurring in the home.

We disagree with Appellants' characterization of BCCYS's efforts in this case, and likewise disagree with their conclusions. "[T]he initial question in a section 1983 action is whether the plaintiff has alleged a deprivation of a constitutional right at all." *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003) (internal quotation marks omitted). Here, BCCYS had reasonable suspicion that, given Mulholland's listing on ChildLine as an indicated perpetrator

29

of child abuse, the children were at sufficient risk to justify seeking their removal.

This case is much different than *Croft*, upon which Appellants principally rely to argue that Mulholland's listing on ChildLine was insufficient to raise a reasonable suspicion of child abuse. In *Croft*, we held that a child services agency lacked "objectively reasonable suspicion of abuse" justifying the forced separation of a father from his wife and child, when the only evidence of abuse was a "six-fold hearsay report by an anonymous informant" and when the father, mother, and daughter all provided consistent and credible statements that no abuse had occurred. *Croft*, 103 F.3d at 1126. Absent reasonable suspicion, we held that "governmental intrusions of this type are arbitrary abuses of power." *Id.*

Unlike the anonymous and vague report of child abuse against the father in *Croft*, the report against Mulholland in 1996 was based on specific, credible, contemporaneous, and mutually consistent evidence, including interviews with then-twelve-year-old Linda Kurtz, who said that Mulholland masturbated in her presence and sexually propositioned her. BCCYS's suspicions were accordingly much more concrete than those of the child services agency in *Croft*. What's more, Mulholland had pled guilty to a harassment charge in connection with the incident and had never challenged his listing on ChildLine through the administrative appeals process provided by the CPSL, so BCCYS had no sound reason to disbelieve the allegations against him.[22] This is in

---

[22] We are mindful of our obligation to review the facts in the light most favorable to the Appellants, *see supra* note

30

stark contrast to *Croft*, where the facts available to the county child services agency "raised serious questions about the veracity" of the anonymous informant. *Croft*, 103 F.3d at 1126.

Nor have Appellants provided sufficient "proof that the defendants consciously disregarded, not just a substantial risk, but a great risk" that their concern about the children was not well-founded. *Ziccardi*, 288 F.3d at 66. Appellants argue that BCCYS's abrupt and drastic measures are so arbitrary as to shock the conscience, because BCCYS had had several interactions with Mulholland without raising concerns over his presence in the home.[23] Perhaps, given the passage of time since Mulholland was listed on ChildLine and in light of the several cooperative interactions the Appellants had

---

14, but even in that light the fact remains that, based on his arrest on July 6, 1996, Mulholland was charged with harassment and he pled guilty to that charge. His claim that he understood the charge to reflect harassment against his wife does not alter the state of his criminal record. Similarly, his assertion that he never received notice of his listing, even if true, does not make unreasonable the County's reliance on the proper operation of its and DPW's policies on providing notice.

[23] This argument disregards, of course, the interactions that BCCYS had with the family in 1998 when Linda ran away from her grandmother's home and again in 1999 when Mulholland's and Kurtz's son was adjudicated delinquent for raping his younger cousin. With respect to both of those interactions, BCCYS expressed concern over Mulholland's contact with his children.

31

with BCCYS, that agency could have acted in a more deliberate and less sudden fashion by providing Mulholland and Kurtz the courtesy of letting them know that it intended to petition the juvenile court for removal of the children. But its failure to do so does not "reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Miller*, 174 F.3d at 375-76. Mulholland's listing on ChildLine remained unrebutted at the time the children were removed from the home, and it was therefore not plainly unreasonable for the agency to believe he had committed child abuse and posed an immediate threat to the children residing with him. We therefore affirm the District Court's judgment as a matter of law on this substantive due process claim.[24]

---

[24] As noted above, *supra* at II.B.1, the District Court conducted a *Monell* analysis to dispose of this claim, holding that Appellants elicited no proof that the decision to petition the court for removal was made by an individual in a policymaking authority. *See McGreevy*, 413 F.3d at 368 (holding that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances" (internal quotation marks omitted)). Given our disposition of the underlying substantive due process claim, however, we need not address the *Monell* analysis on which the District Court relied. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a municipal employee "inflicted no constitutional injury … , it is inconceivable that [the municipality] could be liable").

2. *Attempt to Change Mulholland's Status from Indicated to Founded*

Mulholland and Kurtz also sought to hold the County liable for arguing during the appeals process that Mulholland's status should be elevated in seriousness from "indicated" to "founded" because he pled guilty to the harassment charge arising from the July 1996 incident. The District Court rejected that claim because there was no evidence adduced at trial that BCCYS's litigation strategy "represented an official policy or custom of BCCYS," but rather it represented a specific position on a specific legal issue under facts specific to this case. (D. Ct. Op. at 20.) That alone is a sufficient basis for rejecting Appellants' claim.

Beyond that, the legal position BCCYS took during the appeals process was not so arbitrary that it shocks the conscience. As a result of the allegations of child sexual abuse in 1996, Mulholland was charged with indecent exposure, endangering the welfare of a child, and harassment. Although the indecent exposure and child endangerment charges were eventually dropped, Mulholland pled guilty to the remaining charge of harassment. While Appellants claim that Mulholland pled guilty to harassing Christine Kurtz, not Linda, it was not shocking for the County to believe and to argue that the harassment charge related to Mulholland's behavior toward Linda. The CPSL provides that a "founded" report is appropriate "if there has been any judicial adjudication based on a finding that a child who is a subject of the report has been abused, including the entry of a plea of guilty or nolo contendere or a finding of guilt to a criminal charge *involving the same factual circumstances involved in*

33

*the allegation of child abuse*." 23 Pa. Cons. Stat. Ann. § 6303 (emphasis added). Thus, it does not shock the conscience that BCCYS would argue that the report against Mulholland should be changed to "founded." BCCYS had a defensible argument that the harassment charge, to which Mulholland had pled, stemmed from the same factual circumstances surrounding Linda's allegations of sexual abuse.

## C. *Appellants' Evidentiary Claims*

Finally, Appellants challenge a number of evidentiary rulings of the District Court.[25] We address the substance of only one of those challenges. Appellants claim that the District Court improperly admitted into evidence the July 1996 police report in which Linda Kurtz told police that Mulholland had engaged in sexually inappropriate behavior toward her. According to Appellants, the police report was "extremely prejudicial." (Appellants' Opening Br. at 44.)

Rule 403 of the Federal Rules of Evidence provides,

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

---

[25] We review a district court's evidentiary decisions for abuse of discretion. *Inter Med. Supplies, Ltd. v. Ebi Med. Sys.*, 181 F.3d 446, 464 (3d Cir. 1999). To the extent the challenge involves a legal inquiry, such as the interpretation of an evidentiary rule, our review is plenary. *Barker v. Deere & Co.*, 60 F.3d 158, 161 (3d Cir. 1995).

jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The District Court had broad discretion in its application of rule 403, *see United States v. Lee*, 612 F.3d 170, 184 (3d Cir. 2010) ("A district court's ruling under Rule 403 may be reversed only if it is 'arbitrary or irrational.'" (quoting *United States v. Univ. Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc)), and we cannot say that it abused that discretion when it allowed into evidence the police report that initiated BCCYS's 1996 investigation. To the contrary, the probative value of the report, which described in detail the allegations against Mulholland that he now denies, substantially outweighed any prejudicial effect of the report, not vice versa. In effect, Kurtz and Mulholland assert that the County failed to properly investigate the claim of child abuse, but they then argue that admission of the report that formed the basis of the investigation was prejudicial. The District Court was well within its discretion in rejecting that argument.[26]

---

[26] We need not evaluate Appellants' remaining evidentiary challenges, which are (1) that the District Court erred in excluding certain exhibits regarding BCCYS's interactions with the Heddy family and the family of S.G.'s biological mother, and (2) that the District Court should have excluded as irrelevant a May 1997 psychological evaluation of Linda during which Linda told a licensed psychiatrist that Mulholland "wanted [her] to do stuff to him" and "attempted to engage her sexually while intoxicated." (Appellee's Opening Br. at 43.) Even if we were to reverse those rulings, Appellants' municipal liability claims under 42 U.S.C. § 1983 would still fail as a matter of law. *Cf. Democratic Party of*

### III. Conclusion

For the foregoing reasons, we will affirm the decision of the District Court granting the County's motion for judgment as a matter of law.

---

*Washington State v. Reed*, 343 F.3d 1198, 1207 (9th Cir. 2003) (declining to review appellants' challenges to the district court's evidentiary rulings because, "even without the evidence, appellants are entitled to prevail"). Those challenges do not advance Appellants' burden of establishing that a BCCYS policy or custom led to the deprivation of their rights to due process.